**DENISON MINES LIMITED,**
Plaintiff,

v.

**FIBREBOARD CORPORATION et al.,**
**Defendants.**

**SIMKINS INVESTMENT CO., a Delaware Corporation, Plaintiff,**

v.

**FIBREBOARD CORPORATION,**
**Defendants.**

**Civ. A. Nos. 74–223 and 74–224.**

United States District Court,
D. Delaware.

Nov. 19, 1974.

---

814

William Prickett and Steven J. Roths-
child, Prickett, Ward, Burt & Sanders,
Wilmington, Del., William B. Lawless,
Laurence V. Senn, Jr., and Harold G.
Levison, Mudge, Rose, Guthrie and Alex-

ander, New York City, for Denison Mines Limited.

David A. Drexler, Lewis S. Black, Jr., and William T. Allen, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Hurd Baruch and Walter W. Rabin, Meltzer & Schiffrin, Philadelphia, Pa., for Simkins Investment Co.

William S. Potter and Charles S. Crompton, Jr., Potter, Anderson & Corroon, Wilmington, Del., Charles E. Hanger, and Ronald B. Moskovitz, Brobeck, Phleger & Harrison, San Francisco, Cal., for Fibreboard Corporation.

Edmund N. Carpenter, II, and Richard J. Abrams, Richards, Layton & Finger, Wilmington, Del., John N. Hauser, Donald K. Felt, Bartley C. Deamer, and Stuart C. Walker, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., Albert J. Arostegui, Steel & Arostegui, Marysville, Cal., for Yuba River Lumber Company, Inc., Brunswick Timber Products Corporation and William J. Pendola, Sr.

STAPLETON, District Judge:

These cases [1] arise out of the defendant Fibreboard Corporation's solicitation of proxies in favor of a proposed merger into it of defendants Yuba River Lumber Co., Inc., and Brunswick Lumber Products Corporation (hereinafter sometimes referred to jointly as "Yuba").[2] Fibreboard's common stock is traded on the New York and Pacific Stock Ex-

changes and its securities activities are subject to regulation by the Securities and Exchange Commission, and to the provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934, under which these suits are brought.[3]

Complaints were filed in these actions on October 29, 1974, fifteen days before the scheduled date of the Fibreboard stockholders' meeting at which the proposed merger was to have been voted on. This Court ordered the suits consolidated for purposes of expedited discovery and for hearing on the pending motion for a preliminary injunction against the solicitation or voting of proxies by Fibreboard. A substantial amount of discovery was taken by the plaintiffs. The hearing was held two days before the scheduled meeting, but to enable the Court to deliberate more maturely upon the issues raised, the parties agreed to adjourn the meeting for a week's time without taking the vote on the merger.[4]

Fibreboard and Yuba are both engaged, among other things, in the forest products business, which involves owning timberlands and timber cutting rights, logging and processing lumber, and manufacturing and selling lumber and wood products. In May of 1974, the companies entered into discussions looking toward the possibility of a merger and announced an agreement in principle on merger terms on August 26. After further negotiations, a final agreement

1. Simkins Investment Co. v. Fibreboard Corp. purports to be a class action on behalf of Fibreboard stockholders. Simkins is the benecial owner of 9.9% of Fibreboard's Common Stock.

Denison Mines Ltd. v. Fibreboard Corp., et al., purports to be a derivative action. Denison is a Canadian corporation and owns 7.6% of Fibreboard common.

Fibreboard and Simkins are Delaware corporations with their principal offices in California and Connecticut, respectively.

2. Yuba River and Brunswick Timber Products are California corporations, closely held by defendant William J. Pendola, Sr., and his relatives. Yuba, in turn, owns 4.6% of Fibreboard's common stock, and 100% of its Series A preferred stock (acquired as a result of a 1969 transaction), for a total of 8% of all

voting shares. Mr. Pendola was a vice president and director of Fibreboard from 1969 through 1971, but has not been involved in the management of the company since that time.

3. The relevant statutory provisions and regulations are Section 14(a) of the 1934 Act, 15 U.S.C. § 78n(a), and SEC Regulation 14a, especially Rule 14a-9, promulgated thereunder; Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 thereunder; and Sections 12 and 17 of the 1933 Act, 15 U.S.C. §§ 77l and 77q.

4. The parties further agreed not to initiate any publicity or solicit any proxies or proxy revocations during that period. At the time of the hearing, plaintiffs were seeking SEC approval of countersolicitation materials.

was reached; after approval by the Fibreboard Board of Directors on September 18, this agreement was signed on October 8. Fibreboard prepared a Proxy Statement dated October 9, which was mailed to its stockholders on October 16, 1974.

Under the agreement, Yuba, after divesting itself of certain businesses and properties, will be merged into Fibreboard along with all of its property, businesses, assets and liabilities. Chief among these, as described in Fibreboard's Proxy Statement, are Yuba's "36,000 acres of timberlands containing 190 million board feet of timber . . . contract rights to an additional 128 million board feet of timber . . . [and] three sawmills." In exchange, Fibreboard will issue to Yuba's stockholders approximately 200,000 net additional shares of Fibreboard Common Stock, and 100,000 shares of a new Series B Preferred Stock with net additional annual cumulative dividend rights of $510,000 and a net additional liquidation preference of $9,000,000 over the outstanding Series A Preferred Stock now held by Yuba, which is to be retired.

Plaintiffs' position is that the Proxy Statement is demonstrably false and misleading in a variety of areas, which will be considered individually below. On this motion for a preliminary injunction, their burden is to demonstrate a reasonable probability of success on the merits and that the balance of the equities favors the granting of the relief sought. Gerity v. Cable Funding Corp., 372 F.Supp. 679, 683 (D.Del.1973); Winkleman v. New York Stock Exchange, 445 F.2d 786, 789 (3rd Cir. 1971).

## I. THE PROBABILITY OF PLAINTIFFS' SUCCESS ON THE MERITS.

The challenges to the Proxy Statement which merit discussion, given the limited time available, fall into two categories:

A. Alleged deficiencies with respect to the disclosures concerning the assets of Yuba, and

B. Alleged deficiencies with respect to the experiences of Fibreboard and Yuba during the period from June 30, 1974 to September 30, 1974.

### A. Alleged Deficiencies With Respect To Disclosures Concerning The Assets Of Yuba

Plaintiffs correctly point out that the desire to acquire Yuba's fee timberlands, its timber contract rights and an additional source of wood chips is presented in the Proxy Statement as a primary motivation of Fibreboard in the transaction. While Yuba's mills are mentioned as providing an opportunity to expand Fibreboard's lumber and plywood operations, the value of the Yuba Companies as going concerns was only one of several factors prompting management's recommendation.

Thus, on the cover sheet, the Proxy Statement recites:

Under the terms of the proposed merger, Fibreboard will increase its timber base by acquiring 36,000 acres of timberlands containing 190 million board feet of timber and contract rights to an additional 128 million board feet of timber. These timber holdings, together with three sawmills which will also be acquired, will provide an expanded base for Fibreboard's lumber and plywood operations. They will also provide a significant source of wood chips, the basic raw material for Fibreboard's most important product line, paperboard products.

Under the "Summary of the Business Reasons for the Merger", it is stated:

The proposed merger will increase the Company's timber base, expand its lumber and plywood operations and provide a significant source of wood chips, the basic raw material for the Company's most important product line, paperboard products. . . .

The same theme is developed in the "Business Reasons" section itself.

Plaintiffs stress that in this context the value of Yuba's fee timberland and the value of its contract rights are highly material matters. They argue that the Proxy Statement significantly exaggerates the extent and value of the former and provides no basis for formulating a judgment about the latter. Finally, they maintain that, in reality, the only predicate for a stockholder's judgment on the value of these Yuba assets is a misleading representation in the Proxy Statement the thrust of which is that management and its investment advisor, Lehman Brothers, have considered their value in reaching their respective conclusions that the terms of the merger are fair to the company and its stockholders.[5]

### 1. *Yuba's Fee Timberlands.*

With respect to Yuba's fee timberlands, the "Business and Properties" section of the Statement discloses that Yuba's 36,000 acres of timberland are "located in the western foothills of the Sierra Nevada Mountains and contain approximately 190 million board feet of pine, fir, and other timber species." It is fair to state that little if any further data is provided with respect to the character or value of Yuba's fee timberlands except that the book value net of depletion is set forth in the financials of Yuba as $8,809,004 as of March 31, 1974 and $9,674,007 as of June 30, 1974 (unaudited). The only data providing any basis of comparison between Yuba's fee timberlands and those currently held by Fibreboard is the statement in the section dealing with the business and property of Fibreboard that it "owns approximately 160,000 acres of timberland, located predominantly in California." No statement is made of the board feet contained.

The record shows that Yuba purchased approximately 17,000 acres of its timberland from one purchaser in March of 1973 for $6,620,000. It further reveals that Fibreboard's management relied in part on an appraisal of this land made in September of 1973 by an outside consultant engaged by Yuba which placed a value of $14.3 million on these lands. An evaluation made by Fibreboard's own forestry people sometime between July and September of 1974 placed the value of all of Yuba's fee timberlands at $16,400,000.

Plaintiffs do not assail management's treatment of Yuba's fee timberlands on the ground that it failed to set forth the basis for management's judgment regarding their value to Fibreboard. The reason seems clear and serves to illustrate the problems discussed hereafter in connection with Yuba's contract rights. So far as plaintiffs are concerned, the data which was available to and used by management regarding the character and value of these timber lands is unreliable. As contrasted with management's most recent appraisal of $16,400,000, the affidavit of plaintiffs' expert utilizes materially different data and reaches a valuation of $7,234,000.

Plaintiffs do assert, however, that the reference to 190,000,000 board feet was false and that the reference to 36,000

---

5. The representation referred to is as follows:
The number of shares of Common Stock and Series B Stock of the Company to be issued for shares of capital stock of Yuba and Brunswick and the other terms of the Plan and the Agreement of Merger were determined by arms length bargaining between the Constituent Corporations which took into account the market price of Fibreboard Common Stock and its dividend record, the value to the Company of the Yuba and Brunswick timber holdings, the immediate and long-term prospects of the respective businesses of the three companies, their relative position in other respects, their past sales and earnings records, and other elements of value deemed relevant. The Company was assisted in the consideration of the merger by Lehman Brothers, investment bankers. Lehman Brothers has advised the Management and Board of Directors of the Company that the terms of the merger negotiated between the respective managements are fair to the Company and its stockholders. Lehman Brothers will receive fees for financial advice in connection with the merger of approximately $60,000.
Proxy Statement, p. 8.

acres was only a "half truth" because, as appears from defendant's own survey, 11,300 acres are currently inoperable for logging. The impact of this "half truth" was exacerbated, it is urged, because the only statement with respect to Fibreboard's present holdings is in terms of acreage. I find these arguments unpersuasive.

With respect to the representation of 190 million board feet, the Court is unable to find that it was materially false. Defendants' affidavits provide a substantial basis for a belief on the part of management that the acreage contained approximately this quantity of lumber. In context, I believe that a stockholder would not take the representation as anything other than a good faith estimate based on the available data.

Turning to the Proxy Statement's reference to acreage, I note that the mountainous character of the terrain is revealed and that an approximation of the productivity of the acres is provided by the reference to the total board feet of timber. More importantly, however, no other affirmative representations are made with respect to the character of the Yuba acreage or that of Fibreboard and it is fair to say that no comparison of the two is highlighted or invited in the presentation. A revelation of the fact that a substantial portion of the Yuba acreage was not currently commerically operable would not have improved the ability of a stockholder to make any meaningful comparison between the two holdings.

### 2. *Yuba's Contractual Rights.*

■ As heretofore noted, Fibreboard highlights Yuba's "contract rights to . . . 128 million board feet of timber" as one of the major assets to be acquired by the merger (cover page; pp. 8, 34). Plaintiffs allege that this amounts to a distortion in three ways.

First, plaintiffs contend that this statement "suggests to the unknowledgeable that Yuba has bought and paid for such timber and the only additional expense[s] to it are costs associated with logging, transporting and milling it." (Simkins Br. p. 12). The Court simply does not read the Proxy Statement as conveying this impression. To the contrary, the Court finds the "bid now—pay later" character of industry practice in this area to be sufficiently disclosed in the Proxy Statement's discussion of these contracts.[6]

Plaintiffs' second contention regarding these contracts is that "the evidence strongly suggests many of these contract rights are of minimal or even detrimental value at the present time, a material adverse fact not disclosed" in the Proxy Statement. (Simkins Br. p. 6). They arrive at this conclusion by reasoning that many of Yuba's contracts were bid in 1973 when lumber prices, as a general proposition, were high, and that the present value of such contracts must be "severely depressed" because of current low lumber prices.

I agree that if the evidence showed a substantial likelihood that these contract rights as a whole were of little or no value, that fact would be materially at variance with the implied representations of the Proxy Statement that they have substantial value. The evidence, however, does not persuade me that this is the case. While it is true that 50% of the cutting contracts whose award dates can be determined from the record (S–X–20, 29) were awarded in 1973, it appears that they represent only about 45% of the available board feet of lumber covered by the contracts. It further appears that nearly 90% of the lumber covered by these 1973 contracts is covered by contracts which will not expire until 1976 or later. Indeed, almost 60% of it will be available into 1979. These figures provide no basis for a conclusion that these contract rights will not prove profitable despite current low market prices.

Plaintiffs' third argument requires more extended discussion. They urge

---

**6.** See Proxy Statement discussion at pp. 22 and 26.

that it was incumbent upon management, having asserted the contract rights to be of value, to provide sufficient information in the Proxy Statement to allow a stockholder to judge the validity of that assertion. This, plaintiffs claim, would have required data at least as to the "stumpage" prices of these contracts,[7] the length of the contract period, and the current market prices of lumber, none of which were disclosed.

Ideally, it would be desirable in circumstances like those currently before this Court for proxy statements to provide stockholders with a reliable basis for assessing the value of assets to be acquired. As a theoretical matter, this could be attempted in either or both of two ways: by providing the detailed facts with which an evaluation could be made, or by presenting the conclusions of an appraiser, along with a statement of his qualifications and a general description of what he did. Yet, at the same time, it must be recognized that there are inherent limitations on the utility of a proxy statement as a means of communication in this area and that efforts towards achieving the stated ideal may in many instances create more potential for misunderstanding than enlightenment. The SEC and the courts have repeatedly been confronted with the necessity of reconciling these conflicting considerations.

There is a substantial body of authority which holds, in a variety of circumstances, that management need not set forth in its proxy materials valuations of corporate assets. See e.g., Kohn v. American Metal Climax, Inc., 458 F.2d 255 (3rd Cir. 1972), cert. denied 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972); Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281, 1291–1294 (2nd Cir. 1973); Sun Ray DX Oil Company v. Helmerick & Payne, Inc., 398 F.2d 447, 450–451 (10th Cir. 1968). Indeed, it has long been a general practice of the SEC to discourage insertion of valuations of assets in filings with the Commission.

Gerstle v. Gamble-Skogmo, Inc., *supra*, at 1292–1293; Schneider, Nits, Grits and Soft Information in SEC Filings, 121 U.Pa.L.Rev. 254, 255 (1972).

The Third Circuit Court of Appeals noted the general rule in the *Kohn* case. There the lower court had held that a "clear presentation of the values assigned to the RST assets [to be acquired] . . . and the basis upon which the evaluations were made were crucial to an informed shareholder vote, and the omission of these facts from the explanatory materials was material." The Third Circuit reversed, observing:

> Ordinarily the SEC and the courts discourage presentation of future earnings, appraised asset valuations and other hypothetical data in proxy materials. See Union Pacific R. v. Chicago & N.W. Ry., 226 F.Supp. 400, 408–409 (N.D.Ill.1964) . . . we think this general rule should apply here. No truly reliable estimates of value ever materialized.

To conclude from these authorities, however, that no asset valuations need be disclosed under any circumstances is to paint with too broad a brush. In the cases cited, the valuations of assets involved the exercise of a substantial amount of subjective judgment in the selection of data and in the weighing of the information selected as relevant. In each case the court noted the subjective judgmental element of the appraisal process.

Where the assets involved admit of a reasonably objective evaluation, however, a different result has obtained. In Speed v. Transamerica Corp., 99 F.Supp. 808 (D.Del.1951), aff'd with modification as to damages, 235 F.2d 369 (3rd Cir. 1956), a corporate purchaser of minority stockholder shares was held to have violated Rule 10b–5 through its failure to inform the selling stockholders that it intended to liquidate the corporation and that the market value of an important asset of the corporation had risen substantially above the value

---

7. The stumpage price is the price to be paid for the timber at the time it is logged.

shown on the books. Asserting that *Speed* had been correctly decided, a recent authority distinguished it from other asset appraisal cases:

[T]hat case [Speed] dealt with an inventory of a commodity, tobacco, . . . which was actively traded and whose market value could be ascertained with reasonable certainty on the basis of actual sales. No "appraisal" of market value was required and the dangers that the SEC has perceived in the disclosure of appraised values were not present. Gerstle v. Gamble-Skogmo, 478 F.2d at 1293.

The distinction, of course, is one of degree.

Depending on the nature of the appraisal task, hazards similar to those which inhere in the presentation of asset appraisals can also be presented when a proxy statement attempts to provide sufficient factual data to permit a stockholder, with or without expert assistance, to reach an independent conclusion on value. In situations where the recitation of all information which might be deemed pertinent by some is impractical, the same problems of data selection will be presented. If less than all conceivably relevant information is provided the difficulty of giving the stockholder an idea of the value and limitations of the presentation made may be insurmountable. Once again, the matter is one of degree and requires a judgment weighing the value and reliability of the data which it is feasible to communicate and the potential for misinterpretation in its communication.

In the present case, the question presented with respect to Yuba's contract rights is not difficult to resolve. The value of Yuba's contract rights to Fibreboard was considered by management but there was no appraisal of these rights which arrived at a "bottom line" figure and no specific value was assigned to them in the negotiations. Accordingly, no valuation as such was available for presentation in the Proxy Statement.

The Proxy Statement also concededly provides no "basic facts" upon which a stockholder could arrive at an independent conclusion with respect to the value of Yuba's contract rights to Fibreboard. The Proxy Statement does, however, provide the following information with respect to such contracts in general:

. . . Variations in income from forest products tend to be accentuated by reason of the fact that purchases of timber under government and private cutting contracts are usually made several years ahead of use and are customarily priced in relation to the market prices of lumber and plywood in effect at the time the contract is made. As a general result, when construction money is available on favorable terms and construction activity increases, profits reflect the larger spread between the higher lumber and plywood prices and the lower cost of logs, while at a later date, when interest rates are high and construction financing is difficult, the converse tends to occur, namely, reduced profitability from lower lumber and plywood prices and higher log costs.

Pages 21, 22 and 26 point out that the latter state of affairs is the current one.

Thus, a stockholder is apprised of the market factors that effect the profitability, and, therefore, the value of these contracts. It is true that tables were available, and were reviewed by management, which listed each of the contracts and showed such things as contract date, date of expiration, deposit and stumpage fee, and that none of this information was included in the Proxy Statement. But presentation of these data, though it would have required extensive space in the Proxy Statement, still would not have provided a fair basis upon which a stockholder could estimate the value of the contracts. It would also have been important for him to know that stumpage prices on previously bid contracts are adjusted quarterly by a "Lumber Price Trends Index," which reduces both the profitability of such contracts in a

rising market and their unprofitability when it falls, though to different degrees. (De Moisy Dep. pp. 16–17; cf. Appendix to Miles Aff.) Additionally, he would have had to know the differing costs of production associated with each contract—logging costs, road building and hauling costs, manufacturing costs, and others (De Moisy Dep. p. 16; Burgess Dep. p. 123; "Wall Report" [D–X–8; S–X–24] pp. 16–20; see Miles Aff., Appendix). Nor would this have been enough: since even a high priced contract can be profitable if it is not logged until the lumber market is high, an assessment of the value of these Yuba-owned contracts would also require data on Fibreboard's own contract holdings and its anticipated logging schedule. (De Moisy Dep. p. 17; Burgess Dep. pp. 113–14, 123–128). Presentation of some of this information without the rest of it might well be misleading in itself, and presentation of the entire range of data just discussed in a proxy statement would be virtually impossible. Finally, even with a recitation of all of this information, any conclusion about the value of the Yuba contract rights to Fibreboard would depend in the last analysis, as the Proxy Statement notes, on a prediction of future conditions in the construction industry. For these reasons, the Court concludes that a presentation of the information referred to by plaintiffs was not required and that the Proxy Statement's treatment of these contracts was not false and misleading.

3. *The Representation With Respect To Management's And Lehman Brothers' Evaluation Of The Transaction.*

Plaintiffs' argument that management's recitation of the factors considered by it in making its recommendation is misleading does not merit lengthy comment. On the present record, the Court is unwilling to say either that management did not consider the factors indicated or that the quality of that consideration, in terms of the information relied upon or otherwise, was such as to render the statement made misleading.

■ In contrast, however, plaintiffs' argument with respect to the Proxy Statement's treatment of the Lehman Brothers' opinion has merit. I have previously discussed the limitations which made it impractical to provide the stockholders with a basis for formulating an independent judgment regarding the value of the Yuba lands and contract rights. These limitations are important in evaluating plaintiffs' argument concerning the Proxy Statement's reference to Lehman Brothers' opinion. As noted at the outset, the Proxy Statement presents the proposed transaction as one in which a principal portion of the considerations to be received by Fibreboard will be in the form of the acquisition of certain Yuba assets. Because of the nature of these assets, a stockholder's decision on the benefits of the transaction as a whole must necessarily rest in part on his faith or lack of faith in the judgment of others closer to the situation. The Proxy Statement represents that management has considered the value of the transaction to Fibreboard, including the value to it of Yuba's timberlands, and has concluded that it is fair to the company and its stockholders. It goes further, however, and suggests that Lehman Brothers has made a similar evaluation and has reached the same conclusion. The reason this representation was made is obvious. Because of the independence of Lehman Brothers, as well as its reputation in the investment banking field, its opinion added persuasive support for management's view. In the context of this Proxy Statement, the Court believes the impact of the reference to Lehman Brothers' opinion on a substantial number of stockholders would be difficult to overestimate.

The letter of Lehman Brothers evidencing its opinion includes more than the firm's conclusion. It reviews what Lehman Brothers did to provide a basis for the exercise of its judgment.

Among the recitations contained in this portion of the opinion letter, which is neither referred to nor reproduced in the Proxy Statement or its appendices, is the recitation that Lehman Brothers "reviewed available valuations of the timber . . . to be acquired." As one would anticipate based on the wording chosen here, the discovery conducted thus far, including a deposition of the Lehman partner in charge of this matter, discloses no evidence that Lehman made any independent evaluation of Yuba's timber assets. The fact appears to be that Lehman Brothers, so far as these assets are concerned, relied upon what it was given by management. I do not suggest that there was anything improper in this since Lehman's opinion letter reveals the basis for the opinion expressed. On the present record, however, I find that the bare reference of the Proxy Statement to an opinion of an independent investment firm that the transaction was "fair to the company and its stockholders" without further reference to the basis for that opinion was misleading.

In Kohn v. American Metal Climax, Inc., 458 F.2d 255, 268 (3rd Cir. 1972) the Third Circuit held as follows:

> The district court found that insufficient emphasis was given by the proxy materials to the fact that the endorsement of RST's investment advisers was not based on an independent survey of the assets and operations of RST. The bankers' approval of the proposed amalgamation relied solely on the data supplied by the RST management. This fact is disclosed in Appendix Q. However, no reference is made to this appendicized disclosure at the outset of the Explanatory Statement where the investment advisers' approval of the amalgamation proposal appears. Considering that disclosure of the basis for the advisers' recommendation was of signal importance, we find no error in district court's conclusion that the failure to direct the readers to the disclosures made

in Appendix Q constituted a material omission violative of Rule 10b–5.

In view of the "signal importance" of Lehman Brothers' opinion in the context of this case, it follows from the holding in the Kohn case that the omission of the basis for the Lehman Brothers' opinion was misleading as to a material matter.

B. *Alleged Deficiencies In The Disclosures Concerning The Experience Of Yuba And Fibreboard During The Period From June 30, 1974 To September 30, 1974.*

### 1. *Yuba.*

Pages 23 through 25 of the Proxy Statement contain a "Combined Statement of Income" of Yuba and Brunswick ("Combined Statement"). The statement includes figures for the fiscal year ended March 30, 1974 as well as for the four preceding fiscal years. The statement also contains figures for the three months ending June 30, 1973 and June 30, 1974. An item is included, "Income from operations," which reflects timber, log and lumber sales less cost of sales and "selling, general and administrative expense." The figures reported for this item are: for fiscal 1974, $1,675,000; for the three months ended June 30, 1973, $1,236,000; and for the three months ended June 30, 1974, $89,000.

Further down the Combined Statement is an item entitled "Income from Operations (excluding operations to be divested) before extraordinary items." The comparable figures reported are $1,488,-000, $831,000 and $63,000. This item reflects "Income from operations," plus "Other income," including dividend income from stock of Fibreboard currently held by Yuba, and less "Other expense" and provision for income taxes.

Immediately following the Combined Statement are the following two paragraphs headed "Management's Analysis of Combined Statement of Income of Yuba and Brunswick:

> The primary source of the income of Yuba and Brunswick is the sale of

lumber and logs. The lumber industry is subject to upward and downward swings in demand and prices. These swings are primarily affected by interest rate levels and the availability of funds through their effect on the level of activity in the construction industry, the major market for lumber. Income is also affected by the fact that government and private timber cutting contracts are usually made several years ahead of use and generally provide for payment for the timber cut at prices reflecting the lumber market at the time the contract was made. These factors affected the three-month periods ending June 30, 1973 and 1974 as follows: For the three months ended June 30, 1973, income was affected favorably by sales at relatively high prices of lumber and logs cut under earlier contracts with relatively low timber prices. In contrast, income for the three months ended June 30, 1974 was unfavorably affected by a downturn in the construction industry, caused by adverse money market conditions which resulted in the receipt of lower prices for lumber cut from timber contracted for during times of higher prices.

This adverse trend continued throughout the quarter ended September 30, 1974. Although results of operations are not normally available for 60 days after the end of a quarter, it is presently estimated that the companies incurred a combined net loss from operations (excluding operations to be divested) of approximately $400,000 in the quarter ended September 30, 1974. A significant portion of this loss was the result of an interim write down at September 30, 1974 against a substantial log and lumber inventory as a result of recent decreases in the prices of logs and lumber as reflected by current published prices.

Plaintiffs claim these two paragraphs are false and misleading in a number of material respects. Each of these claims will be discussed in turn.

(a) Plaintiffs maintain that the estimate of a "combined net loss from operations (excluding operations to be divested) of approximately $400,000" is represented as the evaluation of Fibreboard's management when it in fact has been shown to be the estimate of Yuba personnel. In context, the Court believes that the estimate is presented as one of Yuba and, in any event, does not consider the matter material in view of the disclosure at the commencement of the Proxy Statement that "the information contained herein relating to Yuba and Brunswick has been furnished to the company by Yuba and Brunswick."

(b) It is alleged that the above-quoted paragraphs are deficient in failing to set forth that Fibreboard's management expected Yuba to lose money at the rate of 1.5 to 2 million dollars per year for the next twelve to eighteen months. On the present record, the Court is not convinced that Fibreboard's management held this view, but even if it did, there was no duty to include it in the Proxy Statement.[8] The statement here made, when read along with those concerning Fibreboard, disclose a downward trend in the earnings picture for forest products enterprises. This fact, together with the disclosure of the most recent earnings estimate available, was sufficient.

(c) Plaintiffs urge that the $400,000 estimate is misleading because it concededly reflects $109,000 in dividend income from Fibreboard which would not be available following the merger to offset operating losses of the Yuba operations. Fibreboard responds that this estimate of "combined net loss from operations (excluding operations to be divested)" must be read in conjunction with the Combined Statement which the text at

---

8. The evidence supporting the claim that losses of this magnitude were expected, even if credited, is such as to indicate that the estimate was not the kind of information which one would be required to disclose under the holding in Kohn v. American Metal Climax, *supra*, 458 F.2d at p. 265.

this point in the Proxy Statement purports to explain and that in this context full disclosure is made of the items included in the estimate. The Court agrees that the text can be fairly read only in the context of the Combined Statement. This does not entirely solve the problem, however. There is no entry in the Combined Statement that literally reads "net loss from operations (excluding operations to be divested)" and, as a matter of substance, both entries which refer to "Income from operations" could be construed to exclude income from operations to be divested prior to the merger. In the context of a Proxy Statement which emphasizes the value to Fibreboard of an acquisition of Yuba's lumbering operations, the Court concludes that the challenged wording of the text creates a substantial risk that a stockholder might misunderstand the significance of the figure provided. In view of its other rulings, however, the Court believes it is unnecessary to say more.[9]

(d) Next, it is urged that an effort has been made in the text to "cover up" the significance of the estimated loss by attributing "a significant portion" thereof to what is misleadingly represented as a nonrecurring write down in inventory. I find no deficiency here. Yuba's

method of inventory valuation is clearly disclosed in the notes to the Combined Statement and the reason for the write down is clearly revealed as "recent decreases in prices of logs and lumber." The text does not represent the write-off to be recurring or nonrecurring and management's prediction with respect to future log and lumber prices was not required.[10]

### 2. *Fibreboard.*

▪ Plaintiffs also maintain that Fibreboard "misleadingly understate[d] by omission the economic disaster which overtook [its] Forest Products Group in June-September, 1974." Since Fibreboard itself is in the forest products industry,[11] plaintiffs claim that the company's own financial condition, and the conditions of its forest products operation in particular, are material to a stockholder's decision as to whether those operations should be expanded by a merger at this time.

In support of this argument, plaintiffs rely upon the following data which they have drawn from three reports by management to Fibreboard's Board of Directors covering the periods of July, August and September, 1974, respectively. Each report was submitted to the

9. Later figures are now available which, in the absence of clarification, would increase the significance of a misreading of the text. In any resolicitation by Fibreboard management, the more prudent course would be to clarify the wording when the estimate is updated.

10. Plaintiffs make two further arguments concerning the Proxy Statement's treatment of Yuba's recent experience. Due to insufficient development of the record on a number of points, the Court is presently unable to appraise the merit of these arguments. First, plaintiffs contend that Yuba's financial situation would have looked materially worse than it did in the Proxy Statement but for the purchase of a large quantity of its wood chips by Fibreboard at inflated prices during the third calendar quarter of 1974, which facts were allegedly concealed in the Proxy Statement. The Proxy Statement does disclose that Fibreboard has purchased wood chips from Yuba over the past two years and that "most" of these purchases "were made in August and

September of 1974." This fairly states the facts, which are that $352,582 of the total $422,000 of such purchases were made in those months (verified answer of Fibreboard, p. 7). The verified answer of Yuba and Mr. Pendola's deposition testimony deny any price advantage to Yuba, and the effect of these purchases, if any, on Yuba's earnings cannot be determined. Further, plaintiffs contend that a significant portion of Yuba's July to September downturn was the result of a drop in its export sales. Mr. Pendola did predict a drop of about 50% in such sales for Yuba's fiscal 1975 (Dep. 79), but he also explained that such sales are highly seasonal (Dep. 78). The evidence does not reveal how such sales in the last quarter compared to sales for the same period last year, and the significance of the decrease, if any, cannot be determined.

11. In 1973, forest products represented 45% of Fibreboard's total sales and generated 77% of its total direct profits.

Board in the middle of the following month. In the three months ending September 30, 1974, Fibreboard's Forest Products Group suffered an overall $210,-000 "direct loss" as compared with a "direct profit" [12] of $5,339,000 during the same period of 1973. Forest products inventory grew 50% from $20,177,000 at September 30, 1973 to $30,388,000 at September 30, 1974. Short-term bank note debt increased over the same period from $4 million to $29 million, of which $21 million was incurred between July 1 and September 30, 1974.

I first turn to the Proxy Statement's disclosure concerning Fibreboard's recent earnings experience. The table on page 21 shows that the Group's direct profits for the six months ended June 30, 1974 were $7,459,000, as compared with $14,117,000 for the same period of 1973, and textual discussion on that page specifically calls attention to this decline of "approximately 50%." Page 22 discusses the reasons for this downturn, and expressly reveals that the Forest Products Group incurred a loss for the third quarter.[13] It is true that a numerical figure reflecting the exact extent of the loss may have become available about the time of the printing of the Proxy Statement [14] and was not disclosed, but I find that this omission is immaterial in the context of the Proxy Statement. The $210,000 direct loss for the third quarter does not significantly deviate from that which one would expect based upon the disclosures in fact made.

■■ The fact that the Court finds no fault with the Proxy Statement's treatment of Fibreboard's recent earnings experience is not determinative of plaintiffs' argument, however. The question remains whether this discussion of earnings by itself was sufficient in light of other significant changes which occurred in Fibreboard's third quarter and which would not be anticipated from the disclosures made in the Proxy Statement.

Page 49 of the Proxy Statement reveals corporation-wide inventories for December 31 of each year from 1968 through 1973, and for June 30, 1974. The highest figure on that list is the latest, $48,789,000. The comparable figure for September 30, 1974 was $62,-362,000, an increase of over 25% (S–X–10). Inventories for the Forest Products Group are not separately shown in the Proxy Statement; those figures were: September 30, 1973—$20,177,000, December 31, 1973—$18,820,000, September 30, 1974—$30,388,000. (S–X–10). Thus, a comparison of the September 30, 1973 and September 30, 1974 inventory figures for this group would have disclosed a 50% increase.

The record does not expressly disclose exactly when the September 30, 1974 inventory figures for the Forest Products Group were available. However, by the time the Fibreboard Board of Directors approved the merger, on September 18, 1974, they had reviewed Fibreboard's financial results through the end of August. Those results showed inventories for the Forest Products Group at $27,827,000, up 37% from the same date in 1973.

The August and the third quarter figures concerning short-term debt which were not reported in the Proxy Statement also present a picture significantly different from that presented, which included short-term debt figures to June 30, 1974. In particular, the Board knew when it approved the mer-

12. "Direct profit" (or loss) is defined on page 21 of the Proxy Statement as "profits . . . before taxes, general corporate costs, and interest and debt expense."

13. The stockholders are further advised that "the factors reflected in the first six months of 1974 are expected to continue throughout the remainder of 1974 and to result, for the full year 1974 as compared to 1973, in

. . . decreased income from forest products."

14. Company-wide earnings figures were available at the time of the printing of the Proxy Statement and were included . therein. The record shows that the $210,000 third quarter loss for the Forest Products Group was known by October 16, 1974, the date of mailing.

ger that Fibreboard's short-term debt ("Notes payable to banks") was increasing dramatically. The Proxy Statement shows that there was no such debt as of December 31, 1973, and $8,000,000 as of June 30, 1974. It does not disclose that this item rose to $12,000,000 by the following month, to $25,000,000 at August 31, and to $29,000,000 at September 30.[15] The effect of this nondisclosure is highlighted in the context of the more detailed debt information given in Note 4 to Fibreboard's financial statements on page 50 of the Proxy Statement. The table there breaks down this "short-term borrowing activity related to notes payable to banks" in part as follows:

| | Year Ended Dec. 31, 1973 | Six Months Ended June 30, 1974 |
|---|---|---|
| Maximum principal amount outstanding at any month end | $4,000,000 | $8,000,000 |
| Average principal amount outstanding during year | $ 577,000 | $1,874,000 |

The effect of this table is to convey the impression to a reader that short-term debt generally varied within or near the range presented; a stockholder reading the table would have good reason to presume that short-term bank debt as of the date of the Proxy Statement was not totally out of proportion to the figures shown for the past year and a half.

But if the table had been updated to September 30, 1974, it appears that the additional column would have read:

| | Nine Months Ended September 30, 1974 |
|---|---|
| Maximum principal amount outstanding at any month end | $29,000,000 |
| Average principal amount outstanding during year | $ 8,583,000 |

This revised table would have revealed an increase of 625% in maximum month-end short-term debt, and of almost 1,400% in average short-term debt outstanding, over the previous year.[16]

Mr. William Burgess, currently a director of Fibreboard, served as its president from 1964 to 1971 and as chairman of its board from 1971 to 1973. During the course of his deposition, Mr. Burgess was questioned as to whether these marked increases in inventory and short-term debt were matters about which stockholders who were asked to pass upon an expansion of the forest products business of Fibreboard ought to know in order to weigh the advisability of the proposed acquisition at the current time.

15. Fibreboard's "current ratio" appears to have declined from 2.2 to 1 at June 30, 1974, to 1.7 to 1 at September 30, 1974, and its "quick asset ratio" from 0.78 to 1 to 0.45 to 1 at the same dates.

16. Note 4 also points out that Fibreboard had "aggregate unused lines of credit . . . at June 30, 1974 in the amount of . . . $7,000,000." Between that date and August 31, approximately $17,000,000 of new short-term loans were taken out. A substantial portion of the increase in short-term debt appears to be attributable to the performance of the Forest Products Group. See S–X–10, p. C–1.

(Burgess Dep. pp. 105–117). The import of his response was that there were valid business reasons for the short-term debt and inventory build-ups, but that they were significant factors in evaluating the proposal. He further indicated that these factors had been considered by the board, which concluded, however, that in the overall perspective the proposal of management was a meritorious one. The following colloquy is representative of this portion of the deposition:

Q. In the year August 31, 1973, to August 31, 1974, the inventories of the Forest Products Division of Fibreboard declined [presumably "rose"] from 18 million to 27 million, or an increase of 50 percent?

A. Uh-huh.

Q. Do you think that's information that people who were called upon to pass upon an expansion into the Forest Products industry ought to know in order to weigh the validity of such an endeavor?

A. I can't think of anybody who wouldn't understand that. I mean—

Q. Do you think people are entitled to know it, sir?

Q. I mean we understand that you took this factor into account and concluded that this was a deal that you wanted to go through with, in any event, but the question is you're asking other people to pass on this deal. My question of you is: Do you think that they're entitled to know that?

A. I'm trying to think about here is whether it would be a factor which would change their minds. I don't necessarily think that it would be a factor that would change their minds.

Without endorsing the more colorful terminology utilized by plaintiffs in describing Fibreboard's experience during its third quarter, it is fair to say that there was a significant change in its position in the third quarter of 1974 as compared with the same period of the previous fiscal year and with the six months ended June 30, 1974. One important element of this altered picture—a decline in earnings of the Forest Products Group to a loss position in the third quarter—was disclosed in the Proxy Statement. The question, however, remains whether, despite this disclosure, the failure to disclose other available information of a negative import concerning a marked change of position in forest product inventories and the company's short-term debt rendered the Proxy Statement misleading in a material respect.

The applicable standard of "materiality" was set forth in Mills v. Electric Auto-Lite Co., 396 U.S. 375, 384, 90 S.Ct. 616, 621, 24 L.Ed.2d 593 (1970):

[The determination that a misstatement or omission is material] indubitably embodies a conclusion that the defect was of such a character that it might have been considered important by a reasonable shareholder who was in the process of deciding how to vote. This requirement that the defect have a significant *propensity* to affect the voting process is found in the express terms of Rule 14a–9, and it adequately serves the purpose of insuring that a cause of action cannot be established by proof of a defect so trivial, or so unrelated to the transaction for which approval is sought, that correction of the defect or imposition of liability would not further the interests protected by § 14(a). [Footnote omitted; emphasis in original.]

This standard must, of course, be applied in the context of the particular facts before the Court. Here management's proposal was to expand a forest product business which was currently operating at a loss by the acquisition of forest products companies also currently operating at a loss. Under the proposal, Fibreboard would assume approximately seven and three-quarter million dollars in current liabilities ($4 million in short-term bank notes) and undertake an additional annual cumulative preferred dividend charge of $510,000. The proposal came at a time when Fibreboard common stock was selling at or near its historical

low and when stockholders could be expected to be sensitive about short-term, as well as long-term, evaluations of their company.

It is in this context that the significance of the extraordinary increases in Fibreboard's forest product inventory and short-term debt must be evaluated. Viewing the matter from this perspective, the Court concludes that the Proxy Statement was materially deficient in its presentation of Fibreboard's current position. As the Burgess deposition indicates, the sharp inventory and short-term debt upturns "might have been considered important by a reasonable stockholder who was in the process of deciding how to vote." The test is not whether the Court or management can predict that a fuller disclosure would have been determinative of a stockholder's ultimate conclusion. The question is whether the disclosure would have a "significant propensity to affect the voting process." On the current record, the Court concludes that the answer must be in the affirmative.

 Based upon the preceding discussion of the Proxy Statement's treatment of the Lehman Brothers' opinion and Fibreboard's third quarter experience, I find that plaintiffs have carried their burden of showing a probability of success on the merits.

## II. THE BALANCE OF THE EQUITIES.

Where a corporate transaction is consummated based upon stockholder votes solicited by means inconsistent with Section 14(a) of the Securities Exchange Act, an injury is done both to the corporation and its stockholders. J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1963). Where the transaction is a merger which contemplates integration of the two enterprises, as

here,[17] divestiture may well turn out to be an unfeasible remedy; it would at the least be a painful one. See e. g., Allis-Chalmers Mfg. Co. v. White Consolidated, Inc., 414 F.2d 506 (3rd Cir. 1969); Electronic Specialty Co. v. International Controls, 409 F.2d 937 (2nd Cir. 1969).

In these circumstances, the Court is persuaded by the advice of Judge Friendly given in a somewhat comparable context in the *Electronic Specialty* case:

> We agree with plaintiffs to the extent of believing that the application for a preliminary injunction is the time when relief can best be given. . . . [W]e think that in administering § 14(d) and (e), district judges would do well to ponder whether, if a violation has been sufficiently proved on an application for a temporary injunction, the opportunity for doing equity is not considerably better then than it will be later on. The court will have a variety of tools usable at that stage. If the filings are defective or the tender offer misleading, the court can [for example] require correction, along, of course, with an opportunity to withdraw . . . .

409 F.2d at 947.

Whether there is to be a resolicitation or a trial on the merits with respect to the present proxy material, it appears on the current record that the potential injury to Fibreboard and the Yuba interests is limited to that which may arise from a relatively short delay in the stockholder vote and, assuming lawful solicitation and a favorable vote, in the consummation of the merger. While some injury may result from a delay in the consummation of the merger, I conclude that the balance of the equities tips in plaintiffs' favor.

The Court will confer with counsel concerning the form of interim relief.

17. The proposed transaction, for example, contemplates the assumption of Yuba's debt by Fibreboard and the pledging of Fibreboard assets to secure a part of that debt, as well as the utilization of Yuba's assets in Fibreboard's operations.