SOUTH COAST SERVICES CORP., a California corporation, et al., Plaintiffs-Appellants.

v.

SANTA ANA VALLEY IRRIGATION CO., et al., Defendants-Appellees.

No. 78–1964.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 6, 1980.

Decided Feb. 4, 1982.

Dissenting Opinion Filed Feb. 24, 1982.

Rehearing and Rehearing En Banc Denied May 11, 1982.

Frederic J. Milberg, William S. Lerach, Milberg, Weiss, Bershad & Specthrie, San Diego, Cal., for plaintiffs-appellants.

Thomas S. Salinger, Rutan & Tucker, Santa Ana, Cal., for defendants-appellees.

Before KENNEDY, FLETCHER, and POOLE, Circuit Judges.

POOLE, Circuit Judge:

This lawsuit concerns the adequacy of proxy statements soliciting shareholder approval of the sale of the assets of Santa Ana Valley Irrigation Company (SAVI) to Intercoast Investments, Inc. (Intercoast). Plaintiffs-Appellants, invoking this court's jurisdiction under 28 U.S.C. § 1291 (1976), appeal from an order of the District Court for the Central District of California denying a claim for injunctive relief for alleged violations of section 14(a) of the Securities Exchange Act of 1934 (the Act), 15 U.S.C. § 78(n) (1976) and Rule 14a–9 of the Securities and Exchange Commission, 17 C.F.R. § 240.14a–9 (1981). Because we find that the proxy materials in question were not materially false or misleading we affirm the judgment of the district court.

## FACTS

Appellants are former shareholders and directors of appellee corporation, Santa Ana Valley Irrigation Company (SAVI). SAVI was organized in 1877 to distribute water to irrigate the farms of its member shareholders in what is now the eastern portion of Orange County, California. As urban sprawl displaced farming in southern California, SAVI's emphasis shifted from irrigation to real estate holding and development. By the end of 1974 all irrigation operations had been phased out.

In 1977, the year this litigation began, SAVI had diverse land holdings totalling approximately 1,134 acres and was a member of various partnerships and joint ventures engaged in land development. There were 9,281.01 shares of stock outstanding: the approximately 1,400 shareholders were mainly retired farmers, churches, school districts and municipalities. There was no established market for SAVI stock, although occasionally in the three years prior to 1977 a few shares were traded for prices ranging from $400 to $700 per share. The board of five directors collectively owned only about 3% of the outstanding stock. The board was self-perpetuating, there having been no shareholder election of directors in forty or fifty years.

In early 1977 discussions regarding the sale of SAVI commenced between SAVI's General Manager, Thomas Terry, and one Robert Walker. In March, Terry assisted Walker in acquiring the services of Cedric White, a professional real estate appraiser familiar with the SAVI properties. On April 21, 1977, Terry presented to the board on Walker's behalf an offer to purchase SAVI's assets for $700 per share or $5,800,-000 total. The board rejected the offer, at least in part because of a lack of information on which to assess its sufficiency and to make a recommendation to shareholders. Awareness of this inadequacy and anxiety regarding a possible tender offer from Walker spurred the board to seek the services of a professional appraiser. White, the logical choice, refused on the basis of a conflict of interest, since he had already

been retained by Walker. White subsequently asked the board for some information to assist him in making his appraisal. The board conditioned the release of the information on receipt of a copy of the appraisal when finished. White told the board that he could not give them a copy since the appraisal was the property of Walker. White continued his efforts without the information from the board.

Inquiries to other appraisers caused the board to conclude that appraisal of all assets by outside appraisers would be too costly and time consuming. The board settled on a plan whereby professional appraiser Robert Harrison was engaged to appraise only Weir Canyon and a portion of Green River, the two parcels considered the most difficult to evaluate, while management and the board estimated the value of the balance of the properties. In June 1977, the SAVI board instructed its accounting firm to prepare a balance sheet of corporate assets including the historical cost and estimated market value of each property (from information to be furnished by the board and Harrison) with the thought that such figures could be given to the shareholders in response to a possible tender offer from Walker.

To arrive at market values for the properties that were not appraised by Harrison, the board members and general manager, Terry, met and discussed their individual estimates of the value of each separate property. No guidelines were established and no method of evaluation was followed. Instead, each director, on the basis of his own experience and knowledge of the properties, suggested a high, medium and low value for each parcel. Some directors did not give their estimates in writing, and underlying assumptions were not discussed. None of the figures discussed was approved by a vote of the board. Instead, the general manager selected in some fashion from the individual estimates a high, medium and low estimated market value for each property and transmitted this to the accountants. The totals for all the properties if sold individually ranged from a low of $8,150,000 to a high of $12,950,000, compared to a cost basis of $3,349,379.

John Graham, SAVI's accountant, advised the board that, because the estimates were based on speculation and unconfirmed assumptions, the documents he prepared should be restricted to internal use by the board. A cover letter attached to his report contained a disclaimer as to the accuracy or reasonableness of the estimated market values contained therein.

As word circulated that the company was contemplating a sale of all its assets, several potential purchasers surfaced. Shappel Industries expressed strong interest, and, in the course of discussions with SAVI, representatives of Shappel were furnished with a copy of the Harrison appraisals and the board estimates. Meanwhile, Terry had been discussing a possible sale with Intercoast. The negotiations ripened into an offer from Intercoast on July 13, 1977, to purchase SAVI's assets at $800 per share, or $7,425,000 total. On July 18, 1977, the board voted to send a letter to Intercoast rejecting the offer but indicating continuing interest and, further, to send it the same valuation information furnished to Shappel.

Two days later a meeting of the SAVI board was called to discuss a one day only offer from Intercoast to purchase SAVI's assets for $950 per share ($8,994,000 total). As part of the offer, Intercoast agreed to accept SAVI's tax liabilities and pay all costs relating to shareholder approval. The meeting was interrupted by telephone calls from outside companies, including Cadillac-Fairview and Signal Oil, expressing interest in meeting with the SAVI board to discuss the possibility of a purchase. Most notably, Shappel called director Pankey and mentioned a possible $1,300 per share purchase price if the Weir Canyon property could be developed within three years. None of these companies presented a firm offer to purchase SAVI. After lengthy discussion, the board voted three to two to accept the Intercoast offer. Pankey and Balmer, also appellants in this suit, were the two dissenting directors.

On August 18, 1977, by the same three to two majority, the board voted to approve a final agreement providing for the sale of substantially all of SAVI's assets to Intercoast. On that same date, the board unanimously approved a proxy statement soliciting shareholder approval of the sale and authorized the filing of this statement with the Securities and Exchange Commission (S.E.C.). On September 28, 1977, the board approved final proxy materials which were subsequently approved by the S.E.C. on October 6, 1977. On October 7, 1977, the proxy materials were mailed to SAVI's shareholders.

The textual portion of the proxy statement noted the three to two division in the board and stated that the majority had considered the alternatives of a possible sale to a third party, a series of separate sales over time, and continued operation, and that it had concluded that a sale to a third party would maximize return and minimize risk to the shareholders. The statement also informed the shareholders that the majority considered the Intercoast offer fair and more favorable than other proposals considered by the board while the dissenters believed that the SAVI properties were worth more than Intercoast was offering. The statement explained that both the majority and the dissenters had reached their conclusions on the basis of their general knowledge of SAVI and the value of its assets.

The materials additionally stated that SAVI had no current appraisals on any of its properties except Green River and Weir Canyon. It was explained that the board had not obtained current appraisals of the other properties because of the expense and because current market information concerning them was more readily available. No mention was made of the balance sheet prepared by the accountants showing the board's valuations of the properties. In another section, the proxy statement set forth a full description of each property, noting factors bearing on development potential. The descriptions of Green River and Weir Canyon were augmented by the Harrison appraisal, and in each instance the appraisal was qualified by a disclaimer stating that an appraisal is only an opinion and that there was no assurance that the appraised value represented the realizable value of the property.

On November 4, 1977, the board sent a supplemental letter to the shareholders partly in response to shareholder inquiries whether the board was aware of any existing appraisal report relating to all of SAVI's properties. The letter referred to the appraisal report made by White on Walker's behalf and stated that SAVI was not involved in its preparation and had no rights to it. The letter further disclosed that the board had been advised that the appraisal placed a value on the properties considerably in excess of the purchase price offered by Intercoast and counselled against overly relying upon appraisals. The letter repeated the majority's recommendation of acceptance and noted the dissenters' belief that the value of the properties was higher than the offer by Intercoast. The board voted three to two against including its own valuations in the supplemental letter.

At a special meeting of the shareholders on November 15, 1977, the proposed sale was approved by a vote of more than 71% (5,987.6 shares to 1,699.5 shares). On November 18, 1977, the two dissenting directors and twenty-eight shareholders filed a complaint in the district court seeking to enjoin the sale alleging that the shareholders' vote to sell was based on an inadequate and misleading proxy statement in violation of Section 14(a) of the Act and S.E.C. Rule 14a–9. By stipulation of the parties, the consummation of the sale was delayed until after the consolidated hearing on the preliminary injunction and trial on the merits pursuant to Fed.R.Civ.P. 65 (a)(2). The district court found that plaintiffs had failed to show that any aspect of the proxy material was materially false or misleading. Plaintiffs' motion to enjoin the sale was denied and the action dismissed. A timely notice of appeal was filed on March 27, 1978. After entry of judgment in SAVI's favor, the sale to Intercoast was completed and SAVI was liquidated.

STANDARD OF REVIEW

■■■ A two-step level of inquiry is appropriate to determine whether denial of the injunctive relief sought was correct. Because the hearing on the preliminary injunction was consolidated with the trial on the merits pursuant to Fed.R.Civ.P. 65(a)(2), the first inquiry is whether the district court's findings that the proxy statement was not materially false or misleading were clearly erroneous. Fed.R. Civ.P. 52(a).[1] Of course, to the extent it is claimed that the district court misapplied or misinterpreted the law, the findings are freely reviewable. *United States v. Smith*, 625 F.2d 278, 280 (9th Cir. 1980). Even if it is answered that these findings were clearly erroneous, it is of great significance that the sale in this case has been executed and SAVI no longer exists, and, therefore, a second inquiry is whether the circumstances dictate that the sound discretion of courts of equity should be exercised to grant the type of retrospective relief sought by the appellants. "[N]othing in the statutory policy 'requires the court to unscramble a corporate transaction merely because a violation occurred.'" *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 386, 90 S.Ct. 616, 622, 24 L.Ed.2d 593 (1970). *See also Klaus v. Hi-Shear Corporation*, 528 F.2d 225, 232 (9th Cir. 1975). We find it unnecessary to reach this second issue, however, because we conclude that the findings of the district court were not clearly erroneous and that the law was correctly applied.

ANALYSIS

In general, section 14(a) of the Williams Act makes it unlawful for any person to solicit proxies in contravention of the rules and regulations of the Securities and Exchange Commission.[2] Rule 14a–9 of the S.E.C., implementing the Act, provides in relevant part,

No solicitation subject to this regulation shall be made by means of any proxy statement ... containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading....

17 C.F.R. § 240.14a–9(a) (1981).

Appellants contend that the materials furnished by the board of directors to the SAVI shareholders were false and misleading because they failed to disclose (1) the board's estimates of the fair market value of the SAVI properties, and (2) the fact that the board had received inquiries from potential purchasers while it was considering Intercoast's one day offer.

A. *Failure to disclose estimates of value.*

Appellants argue that disclosure of the board's estimates of the fair market value of the SAVI properties was required by Rule 14a–9 because the listing in the proxy materials of the historic book value of the properties without current market information was misleading. The district court rejected this argument and held that the failure to disclose the estimates was not a proxy violation, stating,

As a rule the S.E.C. disfavors inclusion of appraisal information in proxy materials because of the inability of the commission to effectively review the accuracy of such estimates of value and the tendency of shareholders to place undue reliance upon them. [Citations]. An exception to this

---

**1.** Normally, when reviewing an order granting or denying a preliminary injunction, the court will inquire only whether the district court has abused its discretion. *See Klaus v. Hi-Shear Corporation*, 528 F.2d 225, 231 (9th Cir. 1975).

**2.** It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.

15 U.S.C. § 78n(a) (1976).

rule is recognized when the proposed estimates of value are objective, reasonably certain data, such as commodity prices prevailing in an active market. [Citations]. This Court finds that the board's appraisals fall in the former category and were properly excluded from the proxy materials.

█ Appellants claim that the district court erred in its interpretation of the S.E.C.'s position regarding appraisal information and that the S.E.C. in fact favors the disclosure of "current market value appraisal information" in proxy materials. We disagree.

Both the courts and the S.E.C. have consistently discouraged the inclusion of appraised asset valuations in proxy materials. *See, e.g., Gerstle v. Gamble-Skogmo, Inc.,* 478 F.2d 1281, 1292–94 (2d Cir. 1973); *Kohn v. American Metal Climax, Inc.,* 458 F.2d 255, 265 (3d Cir. 1972); *Denison Mines Limited v. Fibreboard Corporation,* 388 F.Supp. 812, 819 (D.Del. 1974). In a note accompanying Rule 14a–9, the S.E.C. has listed examples of "what, depending upon particular facts and circumstances, may be misleading within the meaning of this section." The first example is "[p]redictions as to specific future market values." 17 C.F.R. § 240.-14a–9 (1981). Admittedly, this note does not refer specifically to appraisals of current market value. We agree, however, with the Second Circuit that "it is clear that the policy embodied in the note to Rule 14a–9 has consistently been enforced to bar disclosure of asset appraisals as well as future market values...." *Gerstle v. Gamble-Skogmo, Inc., supra,* 478 F.2d at 1292.

Appellants dispute this reading of S.E.C. policy and argue that the position of the S.E.C. on the issue of appraisal disclosure is reflected in an *amicus* brief filed by the S.E.C. staff in *Gerstle v. Gamble-Skogmo, Inc., supra.* Appellants read the position taken in this brief to approve disclosure of appraisal of current fair market value of assets when a liquidation of those assets is contemplated and their current liquidating value is substantially higher than their historic book value. Under such circumstances, according to appellants, the appraisal must be disclosed if reliable.

We are unpersuaded by appellants' argument for two reasons. First, Commission policy is properly expressed through publicly available rules and policy statements. *See, id.* at 1294, n. 13. We have no more reason than did the court in *Gerstle* to recognize a "substantial modification, if not reversal of the SEC's position on disclosure of appraisals in proxy statements" on the basis of an *amicus* brief reflecting staff views which have been neither formally approved by the Commission nor publicly disseminated. *Id.* at 1294. Indeed, we have even less reason. It was noted in *Gerstle* that the Commission was in the process of reevaluating its policy and that new rules regarding appraisals appeared to be forthcoming. *Id.* However, since *Gerstle,* the Commission has issued certain releases, but no new rules changing its position on disclosure of appraisals.[3]

---

**3.** Appellants point out that a 1976 amendment of the note following Rule 14a–9 deleted future earnings from the list of examples of potentially misleading disclosures. *See,* Securities Act Release No. 5699, *Notice of Adoption of an Amendment to Rule 14a–9, etc.,* [1975–1976 Transfer Binder] CCH Fed.Sec.L.Rep., ¶ 80,461 (1976). We consider this limited amendment to be insufficient to alter the longstanding policy against disclosing appraisal information.

Appellants also point to two recent releases on the subject of disclosure of projections. See, Securities Act Release No. 5992, *Guides for Disclosure of Projections of Future Economic Performance,* [1978 Transfer Binder] CCH Fed.Sec.L.Rep., ¶ 81,756 (1978); and Securities Act Release No. 5993, *Proposed Safe-*

*Harbor Rule for Projections,* [1978 Transfer Binder] CCH Fed.Sec.L.Rep., ¶ 81,757 (1978). These releases are not binding on our decision, as the proxy materials in this case predate their formulation.

Even if these releases had been in effect, they would have affected neither the SEC's position on disclosure of appraisals nor the propriety of withholding the valuations in this case. The 1978 releases deal with net income, and earnings per share. These matters are protected only if disclosed in good faith and if prepared with a reasonable basis. The SEC strongly advocates the disclosure of the assumptions upon which such projections are based. As our later discussion indicates, even if these rules were used as analogous guides, the SAVI

■ Second, even if we were to apply the policy stated in the *Gerstle amicus* brief, we would still affirm the district court's ruling that the SAVI board's valuations were properly excluded from the proxy materials. As noted by the court in *Gerstle*, the text of the *amicus* brief stated that "although appraisals generally cannot be disclosed because they may be misleading, existing appraisals of current liquidating value must be disclosed *if they have been made by a qualified expert and have a sufficient basis in fact.*" Id. at 1292 (emphasis added). Here, the district court found that the SAVI board's valuations were neither based on objective, reasonably certain data nor prepared by a qualified expert.

This conclusion rests on several factors. The first is that the board members, though having considerable experience in real estate in some cases, are not uniformly qualified to value real property. None of the directors are professional appraisers. Second, it is not clear what assumptions were made by each member in assigning a high and low value to each parcel. Without precise information as to the method by which these figures were reached, the board's estimates are potentially misleading. It is precisely such subjective information that the S.E.C. policy is designed to exclude. Failure to include the board's valuation figures was, therefore, not a proxy violation.

We cannot say that these findings are clearly erroneous. It is undisputed that the SAVI directors were not professional or expert appraisers. The board members employed no uniform method of valuation in making their estimates. No guidelines or standards were followed for the selection of relevant data nor for the manner in which data were to be weighed and evaluated. There was no agreement as to the basic assumptions underlying the valuation process. Rather, each director, drawing upon his personal knowledge and experience and relying on subjective assumptions, individually arrived at a high, middle and low figure for each property. It appears that these assumptions were not communicated among the board members. One director apparently based his high estimates on a number of contingencies so that his figures did not necessarily reflect his opinion as to the current value of the property. In addition, the board never formally approved the estimates, and some board members did not know what figures had been selected until they saw the accountants' report. Nor did the board know how the individual figures were compiled, that is, whether the highest and lowest figures were chosen, whether the figures were averaged, or whether some other method was used.[4]

■ Confronted with similarly subjective "appraisals" in *Gerstle*, the court stated that "[w]e seriously doubt that this is what the SEC had in mind when it stated [in its *amicus* brief] that it would allow the work of expert appraisers to be disclosed in proxy statements in some circumstances." 478 F.2d at 1292, n. 10. Thus, even if we were to accept appellants' argument that current S.E.C. policy is reflected in the *Gerstle amicus* brief, that policy would still bar the

board's appraisal valuations could not have been disclosed, as they were not independently reviewed, were not based on uniform or articulated assumptions, and were not prepared with a reasonable basis.

For the same reasons, the board's valuations could not have been disclosed even under the SEC's most recent release, issued after the proxy contest here and after submission of this case, SEC Release No. 34–16833, Fed.Sec.L. Rep. (CCH) ¶ 24,117 (May 23, 1980). The release authorizes disclosure only of appraisals made in good faith and on a reasonable basis in proxy contests in which a principal issue in contention is the liquidation of all or a part of a company's assets or equity.

4. Appellants argue that, because the SAVI board treated the estimates as reliable when it disclosed them to potential purchasers during the course of negotiations, the board is now estopped from contending that the estimates were too unreliable to be disclosed to the shareholders. This contention is not supported by case law. *See Kohn v. American Metal Climax, Inc.*, 458 F.2d 255, 265 (3d Cir. 1972). In addition, the determination as to whether the estimates were based on sufficiently objective and reasonably certain data as to allow disclosure does not turn on the subjective views of the board members nor on the other uses to which the estimates were put.

disclosure of the SAVI board's valuations in the proxy materials.[5]

### B. Failure to disclose inquiries from potential purchasers.

Appellants further contend that the proxy materials were rendered false and misleading by the failure of the SAVI board to disclose that, in addition to the Intercoast offer, it had received inquiries from four other potential purchasers. Appellants argue that this information was necessary to "clarify the import" of the statement in the proxy materials that "[t]he terms of the proposed sale are more favorable than those of other recent proposals considered by SAVI." [6]

Firm offers from other potential purchasers, if they are more favorable than the offer being endorsed by management, must be disclosed in proxy materials soliciting shareholder approval of a proposed sale of corporate assets. *Gerstle v. Gamble-Skogmo, Inc., supra,* 478 F.2d at 1294–95. There is no duty to disclose inquiries or indications of interest that do not fall within the category of firm or definite offers. *See, e.g., Scott v. Multi-Amp Corporation,* 386 F.Supp. 44, 65 (D.N.J.1974). Here, each of the inquiries from potential purchasers, except that from Shappel Industries, consisted of a single telephone call to the SAVI board during its meeting to consider Intercoast's one-day offer. The purpose of the

calls was evidently to request a meeting with the SAVI board to discuss the possibility of a purchase. These last minute expressions of interest clearly do not constitute the type of firm or definite offer that must be disclosed.

While the Shappel proposal poses a slightly more difficult question, we nevertheless find that it was too uncertain and illusory to be considered a firm offer. Shappel informed the SAVI board through Pankey that it was interested in purchasing SAVI for $1,300 per share only if the Weir Canyon property could be developed within three years; if this condition could not be met, the price Shappel would be willing to pay would have apparently dropped to where SAVI would no longer be interested. It appears from the record that there was serious question whether the Weir Canyon property could be developed within three years. In addition, Shappel was not bound by the terms of its proposal, and had SAVI refused the Intercoast offer, Shappel could have withdrawn or changed its proposal. Thus, Shappel's proposal appears to be nothing more than a last minute effort to halt the sale; at best it was but a step in negotiating a purchase, with no assurance whatsoever that such negotiations would bear fruit or, if they did, whether the final terms would have been better than those offered by Intercoast. The failure to dis-

---

**5.** As additional support for their argument that the board's estimates should have been disclosed, appellants point to the statement in the proxy materials that SAVI had no current appraisals of its properties except for the Green River and Weir Canyon properties that had been appraised by White. Appellants contend that this statement was made misleading by the omission of the board's estimates. This particular argument was not made in the district court and hence the district court made no explicit findings on the point. However, in light of the district court's holding that the board members were neither professional appraisers nor uniformly qualified to appraise real property and that the valuation process was highly subjective, we find that the above statement was not false or misleading. An appraisal is defined as "[a] valuation or an estimation of value of property by disinterested persons of suitable qualifications. The process of ascertaining a value of an asset or liability

that involves expert opinion...." Black's Law Dictionary 92 (5th ed. 1979); *see also, United States v. Crowley,* 522 F.2d 427, 429 (7th Cir. 1975).

**6.** This issue was not raised in the district court. Rather, appellants there argued that the reference to "other recent proposals" was misleading because in truth the board had considered only one other proposal, the Walker proposal. Thus, the district court did not make findings on the issue now raised. Appellants have argued to this court that the issue raised on appeal is merely a recharacterization of the issue raised in the district court and that there is sufficient evidence in the record to decide the issue. While we do not condone such practice, we think the issues are closely enough related and the factual record fully enough developed for us to consider the issue on appeal.

close the Shappel proposal and the other inquiries did not, therefore, make the proxy materials false or misleading.

## CONCLUSION

The district court's findings of fact were not clearly erroneous and its conclusions of law were correct. The judgment is therefore AFFIRMED.

FLETCHER, Circuit Judge, dissenting:

Appellant shareholders and directors contend that the SAVI proxy materials misled shareholders by disclosing only the historical cost of SAVI's realty and omitting the board's own estimates of the present market value of the SAVI properties. As noted in the majority opinion, the district court rejected this contention on the basis of its understanding of SEC policy with regard to appraisal information and its assessment of the estimates' reliability. The district court's analysis was incomplete, however, for it failed to take the necessary first step of determining materiality.

Generally speaking, rule 14a–9 is violated if a proxy statement fails to disclose a material fact. In *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), the Supreme Court posited the following test for materiality:

An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.... What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*Id.* at 449, 96 S.Ct. at 2132. In viewing the sale of SAVI's assets within the framework of this standard of materiality, numerous factors persuade me that a reasonable shareholder would have considered the valuations placed on the assets by the board important in deciding how to vote. SAVI was a company whose value was principally in the liquidation value of its real property assets, which had appreciated dramatically from acquisition costs.[1] SAVI's attractiveness to potential purchasers lay in the liquidation value of its real property assets. Noting that the SAVI board disclosed the valuations in question to both Investors and Shapell, the value of the realty assets must have figured prominently in negotiations and was of material importance. The SAVI shareholders as sellers had just as much need for the information to aid in making informed decisions.

Most of the SAVI stock was in the hands of financially unsophisticated shareholders who, under the terms of the sale, were surrendering forever their interest in the SAVI assets. There was no public market for SAVI stock to serve as an indicator of the current value of these greatly appreciated assets. In these circumstances the board's estimates of the assets' current value would be precisely the kind of information that a reasonable shareholder would need and want to inform his decision and, therefore, the board's failure to disclose the valuations constituted a material omission within the meaning of rule 14a–9.

Having determined that the omitted asset valuations were material, it then becomes necessary to assess the majority's argument that their disclosure would have misled the SAVI shareholders. To adequately address this issue, the court must confront and evaluate the once widely held view that appraisals and estimates are, in effect, per se unreliable and misleading information.

1. The balance sheet prepared by SAVI's accounting firm listed total assets of $5,416,-001. The SAVI realty was carried at acquisition costs totalling $3,396,605. The statement incorporated the board's estimates of the fair market value of the realty, ranging from $8,150,000 low to $12,950,000 high.

The majority's analysis of the problem starts from, the premise that the SEC disfavors inclusion of appraisal information in proxy materials.

To support its characterization of SEC policy the majority relies on *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281 (2d Cir. 1973), a case involving a merger between General Outdoor Advertising Company (GOA) and Gamble-Skogmo. In *Gerstle* the plaintiffs alleged that the proxy materials seeking approval of the merger were inadequate because, *inter alia*, they failed to include GOA management's valuations of its advertising plants. For additional enlightenment on the asset appraisal issue the district court had asked the SEC to submit an *amicus curiae* brief. This brief stated in pertinent part:

> When a balance sheet in a proxy statement for a merger reflects assets at an amount that is substantially lower than their current liquidating value, and liquidation of those assets is intended or can reasonably be anticipated, the textual or narrative portion of the proxy statement must contain whatever available material information about their current liquidating value is necessary to make the proxy statement not misleading.

478 F.2d at 1291. Further, the brief recognized that appraisals generally may be misleading but stated that appraisals of current liquidating value must be disclosed if they have been made by a qualified expert and have a sufficient basis in fact. The lower court apparently adopted the *amicus* brief as an accurate statement of the governing principle on disclosure of appraisal information and held that the failure to disclose the management's valuations of assets violated rule 14a–9. On appeal, Judge Friendly, speaking for the Second Circuit, concluded that the SEC brief did not reflect SEC policy as understood by securities lawyers and accountants in 1963, the year in which the challenged proxy materials were distributed. To the contrary, Judge Friend-

ly observed, it had long been an "article of faith" that appraisals of assets could not be included in proxy statements. *Id.* at 1293. He noted that the considerations underlying this policy against disclosure were distrust of reliability, concern of unwarranted reliance by investors, and the impracticability of the SEC's determining reliability in each instance. While acknowledging that "[t]he SEC may well determine that its policy . . . may have deprived those who must decide whether or not to sell their securities . . . of valuable information," *id.* at 1294, the court refused to impose liability on Gamble-Skogmo on the basis of a shift in SEC policy since 1963.[2]

This traditional view against disclosure of appraisal information has found expression in a number of other cases. *See, e.g., Kohn v. American Metal Climax, Inc.*, 458 F.2d 255 (3d Cir.), *cert. denied*, 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972); *Sunray DX Oil Co. v. Helmerich & Payne, Inc.*, 398 F.2d 447 (10th Cir. 1968); *Denison Mines, Ltd. v. Fibreboard Corp.*, 388 F.Supp. 812 (D.Del.1974); *Madonick v. Denison Mines, Ltd.*, Fed.Sec.L.Rep. (CCH) ¶ 94,550 (S.D.N.Y.1974). The policy, reflecting a solicitous regard for shareholders who might place indiscriminate trust in estimates of questionable reliability, had its genesis in the Commission's early efforts under the Securities Exchange Act of 1934 to protect investors from certain companies' practices of luring the unsuspecting with overstatement of assets in registration statements. *See* 2 A. Bromberg, *Securities Law: Fraud* § 6.5 (449) (1977). The Commission's mandate "to stem the speculative tide whenever necessary," S.Rep.No.792, 73d Cong., 2d Sess. 4 (1934), called for measures and policies designed to correct certain abuses thought to have initiated the stock market collapse of 1929 and the ensuing economic depression, but ill-suited to fulfillment of other aspects of the Act's remedial purposes. Attainment of one of those goals, to promote fair corporate suffrage, is inhibited by a policy that counsels withholding material informa-

---

**2.** The court ultimately found liability on the basis of the proxy statement's failure to disclose the fact that Gamble-Skogmo intended

vigorously to pursue a plan to dispose of the advertising plants once the merger was effected.

tion from shareholders voting on a merger proposal. I agree with the drafters of the SEC's *amicus curiae* brief submitted in the *Gerstle* case that in those instances in which the historical cost at which assets are carried in a balance sheet is substantially lower than their current market value, a proxy statement should disclose current appraisals if made by a qualified expert and sufficiently based in fact. In my judgment, this policy is consonant with the purpose underlying the 1934 Act.

The proper frame of reference within which to analyze appellants' contentions is the statutory purpose underlying the proxy rule allegedly violated. Legislative history reveals that by passing section 14(a) of the Securities Exchange Act of 1934 Congress intended to protect investors from making ill-informed decisions to buy or sell securities. Expressing a belief that "[f]air corporate suffrage is an important right that should attach to every equity security bought on a public exchange," H.R.Rep.No. 1383, 73d Cong., 2d Sess. 13 (1934), Congress noted that "[t]oo often proxies are solicited without explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought." S.Rep.No.792, 73d Cong., 2d Sess. 12 (1934). *See also TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 444, 96 S.Ct. 2126, 2130, 48 L.Ed.2d 757 (1976); *Mills v. Electric Auto-Lite*, 396 U.S. 375, 381, 90 S.Ct. 616, 620, 24 L.Ed.2d 593 (1970); *J. I. Case Co. v. Borak*, 377 U.S. 426, 431, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964). Moreover, it reflects a proper regard for the considerations of materiality critical to analysis under the rule 14a–9.[3]

Laboring under the constraining assumption that appraisal information must in most instances be excluded in deference to a blanket SEC prohibition against its disclosure, the district court found that the SAVI board members were not professional appraisers, not uniformly qualified to value real property, and made their valuations based on unascertained assumptions. These considerations alone, however, are insufficient to support the conclusion that the appraisals were potentially so misleading as to justify their exclusion from the proxy materials.

Although the board members were not professional appraisers and arrived at their estimates of value by an undocumented procedure, their appraisals bear certain indicia of reliability overlooked by the court below. Although some members of the board possessed greater expertise in the field than others, all were experienced in real estate matters. They had intimate knowledge of the SAVI properties and were well acquainted with the factors influencing value in the southern California real estate market. Further, the SAVI board treated the appraisals as reliable when they gave them to two potential purchasers without any disclaimer as to reliability. Most significant, they held themselves out to the shareholders as possessing sufficient expertise to value most of the properties themselves and dispense with a professional appraisal. Thus appellees' contentions that the board lacked the expertise to make a reliable appraisal have a hollow ring to them. The board either had no business marketing the property without securing expert appraisals or they had the requisite expertise to evaluate the properties and should share their opinions with their shareholders.

The final step in an analysis of SAVI's alleged liability for failure to disclose the board appraisals is to weigh the factors bearing on materiality against the likelihood that the estimates would mislead the shareholders. The information is unquestionably material within the meaning of rule 14a–9. However, appraisals by their very nature are susceptible to varying interpretation and even manipulation and the SAVI board estimates, while arguably expert, are not the work of a professional appraiser. Yet when these competing concerns are balanced, it is clear to me that the SAVI shareholders' need for the information outweighs the risk of their being mis-

---

**3.** Recalling that the SAVI proxy materials included the appraisals of two parcels of property, this court is not confronted with the problem troubling the second circuit in *Gerstle*, for appellees' own behavior attests to the fact that by 1977 it was no longer an article of faith that SEC policy barred disclosure of appraisals.

led. The SAVI board could have alleviated any concern that the shareholders might be misled or that the intent of the disclosure provisions of the securities laws might be subverted simply by qualifying disclosure of the board estimates with the same sort of language of disclaimer used to dissuade the shareholders from placing undue reliance on the Harrison appraisals. It must be noted also that furnishing some appraisals and not others as was done in this case could be misleading in itself by raising the implication in the minds of some that the value of other properties was unchanged. Reliance on the supposed SEC policy in this case to justify withholding appraisals from shareholders indeed has an ironic twist. The selling shareholders need protection against selling too cheaply. The appraisal information would have helped guard against that. The SAVI shareholders were denied that safeguard. The purchasers, on the other hand, were furnished the information. Thus, I conclude, contrary to the majority, that appellees' omission of the board's valuations rendered the proxy statement materially misleading in violation of rule 14a–9.

In addition to the offer from Investors, the SAVI board received inquiries from four other companies interested in a merger or a purchase of assets. One company, Shapell Industries, signaled the intensity of its interest by suggesting a purchase price of $1,300 per share, $350 more than the Investors offer, if certain contingencies could be met. The board elected not to pursue these so-called "promises in the sky" but rather to accept the firm offer from Investors. Appellants challenge the board's failure to divulge the information regarding other proposals to shareholders who were faced with the same decision whether or not to accept the terms of a proposed sale. Additionally, appellants contend that the information was necessary in order to clarify the reference in the proxy statement to "other recent proposals."

Employing the same mode of analysis used to address appellants' objections to the omission of the board appraisals, my initial inquiry is whether, under the circumstances, there is a substantial likelihood that a reasonable shareholder would have considered information about the other companies' inquiries important in deciding how to vote. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Again significance attaches to the fact that the proposed transaction involved the sale of assets undervalued in the proxy materials. What in another setting might have been a trivial omission becomes important in light of the fact that the SAVI shareholders had a dearth of information to aid their evaluation of the attractiveness of the recommended offer. Disclosure of information about the interest of three other companies and the conditional offer of a fourth might have provided some insight into the intensity of demand for SAVI's assets, their potential value, and the adequacy of the offer under consideration.

The majority finds, however, that the inquiries were properly not disclosed because the companies were merely sending out preliminary feelers. It relies on *Scott v. Multi-Amp Corp.*, 386 F.Supp. 44 (D.N.J. 1974), wherein the court held that such casual inquiries need not be revealed in proxy statements.

Consideration of the Shapell Industries conditional offer of $1,300 per share, however, compels the opposite conclusion. Although the majority states that the offer, conditioned on a contingency perhaps impossible of fulfillment, was not firm, the Shapell proposal's specificity indicated that negotiations had progressed to the serious stage, warranting disclosure to the shareholders. Logic dictates that "management, when endorsing one offer, must inform stockholders of any better ones." *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1295 (2d Cir. 1973) (dictum). *See also United States Smelting, Refining & Mining Co. v. Clevite Corp.*, Fed.Sec.L.Rep. (CCH) ¶ 92,-691 (N.D.Ohio 1968). The information that the SAVI assets had attracted a conditional offer of $1,300 per share would have been of material importance to a shareholder in deciding how to cast his vote on the board's recommendation to accept a $950 per share offer.

Because third-party offers generally reflect an objective assessment of a compa-

ny's worth and do not have the potential for overstatement of value that taints appraisals, *see Gerstle v. Gamble-Skogmo,* 478 F.2d at 1294–95, there is less danger that shareholders will be misled by the disclosure of material but possibly unreliable information.[4] The fact that the Shapell offer was conditional, however, counsels caution. Reliance on the figure advanced by Shapell might give the shareholders a false sense of SAVI's worth.

However, while there was a risk that the dollar amount attached to the Shapell offer might have sparked a gleam in a shareholder's eye and blinded him to the realities of the SAVI properties' development potential, I am convinced that the undisclosed offer's materiality outweighed the danger of misplaced reliance. A sentence or two of admonishment in the proxy statement would have served to alert shareholders to the dangers of jumping to unwarranted conclusions.

---

4. The danger is further reduced when the shareholders to whom the information is disclosed are *selling* shareholders.