**RESOURCE EXPLORATION, Plaintiff,**

v.

**YANKEE OIL & GAS, INC., Defendant.**

**No. C83–956–A.**

United States District Court,
N.D. Ohio, E.D.

April 11, 1983.

Charles F. Clarke, Jr., James J. Maiwurm of Squire, Sanders & Dempsey, Cleveland, Ohio, for plaintiff.

David S. Cupps, Stephen J. Petras, Jr., of Vorys, Sater, Seymour & Pease, Cleveland, Ohio, for defendant.

## ORDER

BELL, District Judge.

This action was filed on March 5, 1983 by plaintiff Resource Exploration, Incorporated (hereinafter Resource) against defendant Yankee Oil & Gas, Incorporated (hereinafter Yankee). Resource's complaint alleges that Yankee has violated the federal securities law, Ohio Revised Code § 1333.51 and the common law of Ohio in relation to the tender offer it commenced on February 28, 1983 for the common stock purchase of Resource. Jurisdiction over the subject matter was invoked pursuant to Section 27 of the Securities and Exchange Act, 15 U.S.C. § 78a; 28 U.S.C. § 1331; 28 U.S.C. § 1332(a); and the court's pendent jurisdiction. Further, in its complaint, Resource requests a declaratory judgment that Yankee has violated Sections 10(b), 14(d) and 14(e) of the Securities and Exchange Act and injunctive relief enjoining Yankee's tender offer and its use or disclosure of confidential information received during friendly negotiations.

A motion for temporary injunction was filed with the complaint and was heard at an evidentiary hearing on March 7, 1983. Preliminary to hearing evidence, however, and after argument by counsel, the court denied Yankee's motion to transfer the case to the Southern District of Ohio. In a memorandum opinion filed March 11, 1983, the court denied Resource's motion for a temporary restraining order. The parties thereafter engaged in expedited discovery.

Currently pending before the court is Resource's motion for preliminary injunction to enjoin Yankee from continuing its tender offer pending a trial on the merits. Hearing on this motion was conducted on March 24 and 25, 1983, during which the court heard the testimony of various witnesses and received in evidence certain exhibits. For the reasons which follow, the court denies Resource's motion for a preliminary injunction.

## I. FACTUAL FINDINGS

### A. The Parties

#### 1. Resource

Resource is a corporation organized pursuant to the laws of Delaware in 1966 with its principal place of business in Canton,

Ohio. It is primarily engaged in the exploration, development and production of oil and gas properties. During the period between June 6, 1978 and February 4, 1981, Resource was a party to reorganization proceedings pursuant to the United States Bankruptcy Act. A Plan of Reorganization was confirmed by order of the Bankruptcy Court on February 4, 1981.

The Bankruptcy Court appointed Mr. Willard E. White (hereinafter White) as receiver shortly after the petition in bankruptcy was filed, and he continued as a trustee of Resource after it filed a petition under Chapter 11 of the Bankruptcy Code in 1980. In February, 1981, White was elected president, chief executive officer and director of Resource, positions which he continues to hold at the time of this litigation.

Resource had 4,964,773 shares of common stock outstanding as of December 31, 1982. These shares are registered pursuant to Section 12 of the Securities Exchange Act of 1934, 15 U.S.C. Section 78*l*(g), and traded in the over-the-counter market. Resource had approximately six thousand shareholders prior to Yankee's tender offer.

2. Yankee

Yankee is a corporation organized pursuant to the laws of Maryland, with its principal place of business in Boston, Massachusetts. Yankee is engaged in the business of drilling and oil field service, natural gas transportation and marketing, and oil and gas operations.

Mr. Paul J. Montle (hereinafter Montle), president and chief executive officer of Yankee, organized that corporation in 1977 as a program syndicator, a company that organizes oil and gas well investments into limited partnerships in which the organizer becomes a general partner and its investors become limited partners. In 1979, Yankee decided to acquire its own in-house operating capability in oil and gas production so that it could operate the wells it was funding. New Frontier Exploration, Incorporated (hereinafter New Frontier) which provided full scale operating capability was

thereafter acquired for this purpose. In the opinion of Yankee's directors, Resource was also interesting in that it offered additional operating capability, its stock was not expensive and it was being run by an excellent management team.

The board of Yankee authorized the purchase of shares of Resource at its January 28, 1981 meeting but limited the amount that could be purchased to under five percent. On or before July 21, 1982, Yankee purchased an aggregate of 99,257 shares, or approximately two percent of Resource's issued and outstanding common stock.

B. *Friendly Negotiations Between the Parties*

By reason of Yankee's ownership of Resource stock, Montle attended Resource's annual meeting of stockholders in January, 1982. Montle introduced himself to White at this meeting. The first open discussion of a possible acquisition occurred at a dinner meeting attended by White and the members of Yankee's executive committee on September 8, 1982. When, on that occasion, Yankee orally offered to purchase all of Resource's outstanding shares for $1.25 per share, White suggested that the offer be reduced to writing so that it could be presented at the Resource board meeting the next day.

On September 9, 1982, the members of Yankee's executive committee attended Resource's board meeting and presented a proposed letter agreement dated September 9, 1982. Thereafter they were asked to step outside so that the board could discuss the offer. According to the minutes of that meeting, discussion was held regarding other contacts that could be made to ascertain any competing interest in Resource. A resolution was passed to make inquiries to that effect. The consensus of Resource's board concerning Yankee's offer was that it was not representative of the true value of Resource. When the Yankee representatives were recalled to the meeting, they were told essentially that the offer was not overwhelming but that it would be considered and they could expect an early response.

At some point in that meeting, Mr. Lance Schneier, a member of Yankee's executive committee indicated that in the event Resource and Yankee did not reach an agreement, Yankee would consider other options available in regard to Resource.

In point of fact, the Resource board not only viewed the $1.25 offer as too low, but also preferred an arrangement having more acceptable tax consequences. Therefore, a letter was sent to Yankee over White's signature on September 16, 1982 refusing the $1.25 offer. It stated that the unanimous vote of the board was not only to reject the offer but also to recommend to their shareholders that they too reject a Yankee offer at $1.25 should one be made to them. White stated in the letter that the conclusions as to Resource's value were based on a reserve report that had been prepared in March, 1982 (the Reserve Report) evaluating the extent and value of its oil and gas reserves and placing the value of Resource shares at over $4.00. The letter clearly left the door open for a counteroffer.

A meeting between Yankee and Resource was promptly requested by Yankee and arranged for September 23, 1982. In anticipation of that meeting, Montle forwarded to White information about Yankee, the purpose of which was to familiarize the Resource board with its background and organization. Yankee was provided with a memorandum prepared by L. Michael McGurk (hereinafter McGurk), vice president, secretary and treasurer of Resource, concerning the advantages of various business combinations structured as mergers rather than a cash tender offer.

The September 23, 1982 meeting took place at Resource's office in Canton, Ohio. During the meeting Yankee proposed an offer involving the exchange of a Yankee $2.50 "zero coupon" debenture for each share of Resource stock. Yankee perceived this as equivalent to an offer of $1.50 and having better tax consequences, an area of concern to Resource. The Resource board's evaluation of the offer, however, concluded that this proposal effectively increased the offer only to $1.27 per share and should also

be rejected. White informed Yankee of this result by letter dated September 29, 1982, and said Resource continued to be interested but that the price would have to be raised to at least $3.85 per share. In late October, Montle made a subsequent offer to White in a telephone conversation proposing an exchange of Resource shares which they would value at $1.50 for Yankee shares. White communicated this offer to Resource's board which again rejected the offer as inadequate. Montle was told of the rejection in a telephone conversation with White on November 2, 1982. He told White that, considering the wide margin between Yankee's offer of $1.50 and Resource's asking price of $3.85, there would be no further pursuit of the matter.

## C. The Reserve Report

The Reserve Report relied upon by Resource in rejecting Yankee's offer was prepared by E.E. Templeton & Associates, Incorporated (hereinafter Templeton), a petroleum engineering firm, for the purpose of enabling Resource to seek bank loans. Credit was important to Resource in order to finance exploration and development activities. Depending upon income from its existing wells alone would not adequately provide future revenues due to their eventual depletion. Having recently come out of bankruptcy proceedings, however, there was little capital for the necessary drilling of new locations. Banks commonly require a detailed engineering study (similar to the Reserve Report) before approving loans to oil and gas companies. Resource secured a revolving line of credit with the Harter Bank & Trust Company, Canton, Ohio, on the basis of the March 31, 1982 Reserve Report.

Oil and gas companies are required to file an annual Form 10K with the Securities and Exchange Commission (hereinafter SEC). A reserve report is prepared for this purpose but differs in several material respects from the Reserve Report commissioned for the purpose of a bank loan. First, a Form 10K only requires disclosure of the proved developed reserves of an oil

and gas company; *i.e.,* hydrocarbons from wells that are drilled, completed and capable of producing. This information is published in the aggregate and not on a well-by-well basis. Therefore, the well-by-well data is not available in the publicly filed Form 10K. A reserve report produced for in-house purposes (such as seeking bank loans), on the other hand, may include specific information broken down by well and covering proved undeveloped as well as proved developed reserves. Public disclosure of the well-by-well analysis would be competitively harmful to an oil and gas company.

A second point of difference between reserve reports prepared for Form 10K filings and private purposes is that in the former, the SEC defines the escalators and discount factors to be used, while in the latter, various escalators and discount factors may be assigned relative to the purposes of its preparation. The estimated discounted net revenues would most likely differ in the two reports.

The Reserve Report which Templeton prepared on Resource for the purpose of its bank loan consists of valuations based on individual well information relative to past production data and performance history, well location, percentage interest of the company in each well, status of any lease on which wells are located, oil and gas prices, production preserves and temperatures and other engineering data, and operating costs. On the basis of this information, economic forecasts are made involving escalator factors for the projected future prices of gas and oil and operating costs and discount factors to arrive at the present value of the reserves. The Reserve Report consists of three parts:

1. a summary report of the results of the Templeton study and the economic predictions of the interests of Resource as of March 31, 1982;

2. Appendix I to the summary report which includes performance curve analysis of individual wells based on historical production data;

3. Appendix II to the summary report which includes specific information about each well covered by the report—drilled wells in each drilling program. Projections were made and included concerning the annual production from Resource's interest in each well.

The Reserve Report cannot be duplicated by compiling information available through public sources. Combining data from the Reserve Report with publicly available records, however, would enable a competitor to determine the exact location of each Resource well. The Reserve Report also indicates the value of each Resource well so that once the location was ascertained competitive drilling could be waged in potentially lucrative areas.

Resource treated the Reserve Report as a confidential document. It was kept in a locked file and available only to key personnel. Not all requests to review it by companies negotiating with Resource were honored; in fact, a specific request by Berea Oil & Gas, Incorporated was refused by the Resource board at their September 16, 1982 meeting. In addition, a resolution was passed at the board meeting on that date which mandated that only public information would be given to companies expressing an interest in merger or acquisition of Resource.

D. *Yankee's Receipt and Use of the Reserve Report*

The first knowledge Yankee had of the Reserve Report came as a result of the reference to it in White's letter of September 16, 1982 which letter rejected Yankee's initial $1.25 per share cash offer. The Reserve Report was again referenced at the September 23, 1982 meeting at Resource's Canton, Ohio office during the course of friendly negotiations. Since this report was Resource's basis for considering Yankee's offer inadequate, Yankee officers at the September 23rd meeting, asked for a copy which White provided. Resource officials made this decision because it was interested in a business combination with Yankee and

felt that review of the Reserve Report would result in Yankee returning with a higher offer.

Officials from both companies understood the need for maintaining the Reserve Report's confidentiality. The conditions imposed .by White before he turned it over were that it would be reviewed only by Yankee and its banking group (in relation to the funding Yankee was seeking for the Resource tender offer), that no copies would be made and that it would be promptly returned after a response was formulated. A letter from Montle to White dated September 24, 1982 essentially affirmed these conditions and agreed to hold the report in confidence and not to disseminate it in any way outside of Yankee and its bank group. Both parties to these discussions were at all times aware that Yankee would share this report with the bank from whom financing was being sought for the offer. Yankee officials testified that they were uncertain as to whether they were told not to copy the Reserve Report but that this condition was conceivable.

The appendices to the Reserve Report were taken to the New Frontier (a Yankee subsidiary) offices in Canton. Montle ordered that a copy be made at some point thereafter. The copy was given to Bernard C. Voyten (hereinafter Voyten) in the engineering department of New Frontier sometime in December, 1982. Voyten reviewed the appendices to determine if the conclusions drawn were reasonable; he was then instructed to take the copies of the appendices to Pete Cawthon (hereinafter Cawthon), the consulting petroleum engineer for the First National Bank of Boston (hereinafter First National), in Texas. These engineers spent two days reviewing the documents which resulted in the conclusion that the appraisals were reasonable and fairly represented. Cawthon continued a thorough review of the appendices keeping them approximately two and one half months. First National later solicited his view of the appendices in relation to extending Yankee credit for the unfriendly tender offer. The summary of the Reserve Report was forwarded to Charles Woodward (hereinafter Woodward) Yankee's loan officer at First National who has been involved in making commercial loans to oil and gas companies for the last several years.

The original Reserve Report was returned to Resource in October after White made several phone calls about it and eventually sent a messenger to New Frontier's office to pick it up. It was contained in a new binding which Resource officers immediately noticed.

## E. The Hostile Tender Offer

When all possibilities of a friendly takeover were thought to be exhausted in late December, 1982, Yankee began discussions with First National regarding an eight million dollar take-down of its twenty-five million dollar credit facility to finance an unfriendly tender offer. The Yankee board, in the meantime, passed a resolution at its December meeting authorizing the purchase of up to a million and a half dollars worth of stock in various companies, including Resource. In January, 1983, prior to Resource's annual meeting, Montle invited White to have dinner with him. The topics discussed at that meeting included what figure the Resource board would recommend to its shareholders in relation to a friendly offer by Yankee and the concept of "rolling up" a group of limited partnerships in which Yankee and Resource participated into a public corporation. Montle indicated that he was impressed with the management of Resource and with White in particular and asked him to be a part of Yankee. Friendly negotiations were not resumed after this discussion.

At the February 11, 1983 Yankee board meeting, Montle requested and was granted the authority to increase purchases of stock in publicly held companies engaged in the energy industry from one and a half to two and a half million dollars. This amount was to cover all purchases including the stock of Resource. The resolution allowed Yankee to become up to a ten percent shareholder in any given company.

Financing approval from the bank for Yankee's unfriendly tender offer came through on or about February 24, 1983 and four days later the tender offer was commenced. There have been three supplements issued to the original offer covering additional information and developments in these proceedings. The figures from the Summary of the Reserve Report were included in the first supplement but no other information regarding the well-by-well analysis has been disclosed. Yankee still held approximately two percent of Resource's outstanding shares at that time having purchased no new shares after September, 1982 when friendly negotiations began. Resource stock was trading in the public market at approximately $.875 per share prior to Yankee's negotiations to purchase at $1.25 per share, that latter figure representing a forty-two percent premium over the public market. Resource stock has been selling at a significantly higher price recently, a fact that has been brought to the attention of the shareholders by Yankee in a supplement to its offer.

### F. Resource Management's Response to the Hostile Tender Offer

On November 2, 1982 Montle and White discussed by telephone the last offer Yankee made to the Resource board. White told Montle that Yankee's offer to exchange Yankee stock for Resource stock at the rate of $1.50 per share had been rejected by the Resource board. Montle then said that there would be no further offers by Yankee due to the wide disparity between Yankee's latest offer of $1.50 and Resource's asking price of $3.85.

On November 3, 1982, Resource announced in a press release that preliminary results of a discovery well it owned in Chautauqua County, New York, were quite promising and might be significant in relation to its overall reserves. A new reserve report was ordered including the Chautauqua figures. It was completed and delivered to Resource in late March, 1983.

Resource promptly responded to Yankee's unfriendly tender offer on February 28, 1983 with a "Stop, Look and Listen" letter to their shareholders dated March 2, 1983 which encouraged them not to sell their stock due to the inadequacy of the offer. To illustrate why management was urging them not to sell, the letter stated, first, that book value for the shares as of December 31, 1982 was $2.25 per share; second, that the recent significant New York discoveries had increased the proved reserves of the company; and last, that the quoted price of Resource shares on the over-the-counter market had been $1.75 as recently as five weeks prior to the Yankee offer to shareholders.

On March 5, 1983, Resource's management filed this action to enjoin the proposed take-over by Yankee claiming the tender offer had violated the Williams Act by failing to disclose the contents of the Reserve Report. Further, this disclosure was claimed to be impossible because it was covered by the confidentiality agreement.

### II. CONCLUSIONS OF LAW

Under the applicable Sixth Circuit precedent, four factors must be considered in determining whether an injunction should be granted:

1. Whether the plaintiff has shown a strong or substantial likelihood or probability of success on the merits;

2. Whether the plaintiff has shown irreparable injury;

3. Whether the issuance of a preliminary injunction would cause substantial harm to others; and

4. Whether the public interest would be served by issuing a preliminary injunction.

*Mason County Medical Association v. Knebel,* 563 F.2d 256, 261 (6th Cir.1977).

The *Mason County* factors should not be weighed mechanically in deciding if the injunction should be issued. Rather we are instructed that the court should weigh each of the factors in light of the factual circumstances of the case. *Roth v. Bank of the Commonwealth,* 583 F.2d 527, 537–38 (6th Cir.1978), *cert. granted,* 440 U.S. 944, 99

S.Ct. 1420, 59 L.Ed.2d 632 (1979), *cert. dismissed,* 442 U.S. 925, 99 S.Ct. 2852, 61 L.Ed.2d 292 (1979).

Given this controlling case law, the court will now turn to the consideration of Resource's motion in light of each of these factors.

## A. *Likelihood of Success on the Merits*

### 1. Claims of SEC violation.

■ Resource contends that Yankee's tender offer violated sections 10(b), 14(d)(c) and rule 10–b–5 of the Securities and Exchange Act of 1934, as amended by the Williams Act, due to allegedly false and misleading statements of material fact made therein as well as various alleged omissions of material facts. This court has already ruled that Yankee is neither an insider or fiduciary for purpose of requiring disclosure under these statutes. *See* Memorandum and Order, March 11, 1983. Therefore, Yankee had no obligation on this basis to disclose non-public information to the shareholders.

■ However, the Williams Act does subject offeror's to certain disclosure requirements in a tender offer which parallel the other anti-fraud proscriptions of securities law. *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 358 (2d Cir. 1973), *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973). The purpose underlying the Williams Act provisions relating to tender offers is to insure that public shareholders confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the offering party. *Rondeau v. Mosinee Paper Corporation,* 422 U.S. 49, 58, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12 (1975). Additionally, the shareholders are protected by a broad antifraud prohibition, section 14(e) of the Securities Exchange Act, 15 U.S.C. section 78n(e), expressly directed at the conduct of persons seeking to influence the decision of shareholders or outcome of the tender offer. *Piper v. Chris-Craft Industries,* 430 U.S. 1, 24, 97 S.Ct. 926, 940, 51 L.Ed.2d 124 (1977). It is provided in 15 U.S.C. section 78n(e) that:

(e) It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.

■ Disclosures under the Williams Act, however, are only required as to *material* information. To be material there must be a substantial likelihood that a reasonable shareholder would consider it important in making an investment decision or would view it as altering significantly the total mix of information before him. *T.S.C. Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). After a finding is made that there has been a material misstatement or omission, it must still be determined whether it was done with sufficient culpability to justify granting relief; with knowledge that material facts were misstated or omitted or, by failure to ascertain such facts when they were available and could have been discovered with reasonable effort. *Chris-Craft Industries, Inc. v. Piper Aircraft, Inc., supra* at 362.

The main argument of misstatement waged by Resource is that Yankee's definition of undeveloped reserves in its Supplemental Offer is "egregiously untrue." This, it contends, has resulted in a material understatement of the value of Resource reserves. The definition Yankee used is in standard usage in the industry and, in fact, was taken from Resource's Form 10K. Resource argues, however, that the definition used in this Reserve Report does not include undrilled reserves which Yankee's definition does. The result is that when Yankee disclosed the summary figures for the value of Resource reserves, it appeared to encom-

pass reserves yet undrilled. The value of Resource reserves would, it is claimed, be greater if these reserves were included, and therefore, Resource reserves have been seriously understated by using the definition selected by Yankee.

In the Third Supplement to its offer, however, Yankee reported to Resource shareholders that there had been testimony at the preliminary injunction hearing in this court relevant to this definition stating that no reserves were assigned to undeveloped acreage or so-called behind-the-pipe reservoirs. This disclosure adequately addresses any possible misstatement and has negated effectively Resource's contention.

Resource's second SEC claim is that Yankee has omitted a statement of facts necessary to make the offer not misleading by failing to disclose the well-by-well information contained in the Reserve Report. In an addendum to its offer, Yankee did disclose that it had received the Reserve Report. Thereafter, in its Supplemental Offer, Yankee disclosed the value assigned to the oil and gas reserves taken from the summary to the Reserve Report but did not disclose the specific production and economic projections contained in the appendices. Disclosure of the values from the summary was done with Resource agreement.

Although the information in the appendices is useful for in-house planning and confidential in that if exposed, competitors would have the capacity of purchasing leases near lucrative Resource wells, it is not material in this tender offer context because it contains speculative information concerning potential oil and gas reserves and valuations based on arbitrary and shifting economic assumptions. Any inquiry as to whether an omission is material must focus on its effect on a reasonable investor's decision whether to tender his shares. The test is whether a reasonable investor would attach importance to a fact in determining his choice of action. *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 849 (2d Cir.1968) (*en banc*), *cert. denied, sub. nom., Coates v. SEC,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

Ordinarily disclosure of future earnings, appraised asset valuations and other hypothetical data is discouraged by the SEC and the courts. *Kohn v. American Metal Climax, Inc.,* 458 F.2d 255, 265 (3d Cir.1972), *cert. denied,* 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972); *Dower v. Mosser Industries, Inc.,* 488 F.Supp. 1328, 1338–39 (E.D.Pa.1980), *aff'd,* 648 F.2d 183 (3d Cir.1981). The rationale for omitting such information is that it is apt to create more potential for misunderstanding than enlightenment. *Denison Mines Limited v. Fibreboard Corporation,* 388 F.Supp. 812, 819 (D.Dela.1974). Hazards inhere when one tries to disclose sufficient information to a shareholder who, with or without expert assistance, attempts to make an independent decision concerning value. Involved is either a selection of data to be disclosed or presentation of all conceivable relevant information, both of which are potentially burdensome and/or potentially misleading. *Id.* at 820.

The information contained in the appendices to the Reserve Report is both complex and speculative. How much of it would have to be disclosed to aid a shareholder in making an independent evaluation that the figures are correct is far from certain. Even if the figures were found to be correct, such predictions may not necessarily be reliable for the shareholder's decision to sell stock. In White's testimony, it was admitted that even Resource uses this information only as a planning or in-house device.

Resource has relied on the unreported case of *General Portland, Inc. v. Lafarge Coppee S.A.,* No. CA 3–81–1060–D (N.D. Tex., August 23, 1981), to support its Williams Act contentions. While it is true that this is a factually similar case, there are several significant distinctions.

In *General Portland* a report was received under a written agreement as to confidentiality which included a promise by the offeror that it would not purchase securities of the target without approval by the target's board of directors. This is clearly

not the case in the facts before this court. Here the agreement between the parties was that the report would be used only by Yankee and its banking group in relation to its offer. No protection against an unfriendly tender offer was sought by Resource. There are two facts which lead this court to conclude that Resource knew of the threat of a hostile offer at the time it gave the report to Yankee. First, it was mentioned at the Resource board meeting on September 9, 1982 that Yankee was interested in Resource and may pursue its other options if unfriendly negotiations broke down. Second, in White's letter of September 16, 1982 to Yankee rejecting Yankee's cash offer of $1.25, White states that Resource's board not only rejected the offer because of its inadequacy but also that it would advise its shareholders not to sell at that price if Yankee went directly to them.

█ Another point of distinction between the cases is the nature of the information contained in the confidential reports. In *General Portland,* the confidential report contained "hard" factual data related to cement plant-by-plant cost information which if disclosed publicly would allow competitors to selectively adjust their prices and thereby offset any pricing advantage the target may have had in the market. Although there is "hard" information in the Reserve Report which would be competitively harmful if disclosed, most of the information is "soft", *i.e.* predictions and analysis relating to future production and revenues. Soft information is not required to be disclosed by the Williams Act. *Harkavy v. Apparel Industries, Inc.,* 571 F.2d 737 (2d Cir.1978); *SEC v. Texas Gulf Sulphur Co., supra.* The burden of requiring disclosure of the information upon which these predictions are based is that Yankee would have to either select which data was necessary for a shareholder to make an independent evaluation or disclose everything conceivably relevant. *See Dennison Mines Limited v. Fibreboard Corporation,* 388 F.Supp. at 820. This court is of the opinion that both courses of action involve "more potential for misunderstanding than enlightenment." *Id.* at 819. Therefore, the

purposes of the Williams Act would not be carried out by requiring disclosure in this case.

Another point of concern in disclosing the information contained in the appendices is that this information is a year old. A new reserve report has been prepared and delivered to Resource presumably covering the New York discoveries which Resource has recently announced. Resource's petroleum engineer testified that there could be variances of five to ten percent over a year's time. The materiality of the first Reserve Report is questionable under these circumstances.

Yankee had already decided to acquire Resource when it received the Reserve Report. The original offer to Resource of $1.25 per share was determined by using public information and the market price plus a premium. Even though the Reserve Report was received by Yankee's bank, it was only for the purpose of taking down an existing credit line and not for the establishment of a new one. In addition, to determine its significance, the bank had its own petroleum engineer check the figures due to the complexity of the report. Essentially Yankee did not rely on the Reserve Report in making the tender offer.

Yankee disclosed the estimated net proved reserves, the estimated future net production, the estimated future net revenue and the estimated discount net revenues of Resource—all figures were drawn from the summary to the Reserve Report. A caveat is given to the shareholder that the information has not been verified by Yankee and the disclosure discusses reasons why the figures given should not be relied upon as being representative of the actual reserves which may be recovered in the future. This disclosure adequately satisfies the mandates and purposes of the Williams Act.

Resource points to certain other claimed misstatements and omissions, but upon review, the court finds that any of these "defects" would not affect the total mix of information or affect the shareholder deci-

sion in any way; if they are "defects," they are not material.

### 2. Common Law Claims

■ Resource contends that Yankee's misleading disclosures and omissions are fraudulent at common law. This court finds this contention without merit in that in view of the discussion of the SEC claims, a reasonable investor would not be mislead by the representations or omissions in this offer and supplements.

### 3. Ohio Law Claims

■ Resource claims that Ohio's trade secret law, Ohio Revised Code Section 1333.-51(A)(3) (Pages 1979), prevents any disclosure of the Reserve Report in this offer. It is argued that trade secrets are protected in Ohio when received under an express or implied restriction of non-disclosure. *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974). There was an agreement of confidentiality covering trade secrets in the Reserve Report, but the court is of the opinion that it has not and need not be violated to carry out the requirements of the Williams Act.

The salient trade secret aspect of the Reserve Report is the well-by-well analysis and projections which, together with the locations of the wells as drawn from public records, could be used competitively to Resource's detriment. In the area of competition this information is highly useful even though speculative. As we have indicated previously, it is not necessary to recount all of this information to shareholders under the Williams Act for them to make an informed decision. Therefore, the tension between the Williams's Act and Ohio's trade secret law that plaintiff advances does not exist in this case.

Yankee agreed not to disclose this information to anyone other than its employees and its banking group. White testified that at all times persons connected with a bank, such as its petroleum engineer, were included in that condition. Therefore, there has been no violation of this condition attached to the receipt of the Reserve Report.

It is true Yankee made a copy of the report which might technically be considered a breach. There is no evidence, however, that it was used contrary to the agreement to keep the report confidential or that Resource has been harmed by its use.

In light of this discussion the court is not persuaded that violations of the Securities Act, common law or Ohio law have occurred. Instead, it appears that the shareholders have been given sufficient information from both the offeror and the target's management to decide their course of action. Therefore, it must be concluded that success at trial on the merits is highly unlikely.

### B. *Irreparable Injury to Resource*

■ Resource claims that it and its shareholders will suffer irreparable harm if Yankee is allowed to proceed without disclosing the Reserve Report. The basis of this argument, that the shareholders will be misled into underestimating Resource's oil and gas reserves, has been discounted in the previous discussion of the merits.

Although the cases advanced by Resource amply support the premise that relief at this stage is recommended where the situation would be difficult to restore, the harm threatened to Resource is not that compelling in this case. The court has stated that on the basis of all of the facts presented in the testimony, stipulations and exhibits bearing on this issue, Yankee has made sufficient disclosures to the Resource shareholders. The Resource board has also informed the shareholders of reasons for their conclusion that Yankee's offer is inadequate. *See supra* at 61. On the basis of information received from both Yankee and Resource management, the court finds that Resource shareholders have sufficient facts before them to make an independent decision as to whether to sell their stock. The possibility of irreparable harm to Resource shareholders is, therefore, minimal.

Resource has not been harmed by Yankee's use of the Reserve Report. It has, in fact, been used exactly as the parties agreed it would be. There was no evidence that Yankee used the Reserve Report in any way other than in relation to its offer.

## C. *Harm to Others*

Harm may be caused to both the Resource shareholders and to Yankee by delaying this offer. Even though Resource argues that the offer may be renewed if Yankee should succeed after injunctive relief has been granted, the delay may injure Yankee in pursuing other companies, if in fact the shareholders do not decide to sell in response to its offer. The shareholders also may be harmed if Yankee decides instead not to renew its offer. It is to be noted that there have been no other offers or interest in the acquisition of Resource.

There is at least a minimal amount of harm possible to others in granting the injunction. In view of the resolution of the other factors, the balance favors its denial.

## D. *Public Interest*

■ The policy of the securities laws is to give investors full and fair access to material information on which to base their investment decision. *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 22–37, 97 S.Ct. 926, 939–947, 51 L.Ed.2d 124 (1977). However, once it has been determined that the mandates of this policy have been satisfied, public policy then requires that the market place be allowed to operate unhindered and that courts avoid tipping the balance. *Id.* at 31, 97 S.Ct. at 944. Here disclosures have been made by the offeror, Yankee, and communications have been made to shareholders by Resource's management. In a situation where both sides of the transaction are available to advise the shareholders, public policy favors the abstention by courts from interference with the market process in determining the adequacy of the offer.

## III. CONCLUSION

It is the finding of the court that there is not a substantial likelihood that Resource will prevail at a trial on the merits; that a showing, although not strong, of potential harm to Resource has been made; that harm is also possible to Yankee by delaying the offer; and that public policy favors denying the injunction. In light of these findings, the court finds that preliminary injunctive relief is inappropriate. Accordingly, the motion for a preliminary injunction is denied.

IT IS SO ORDERED.